## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARIO CACHO and ANTONIO OCAMPO, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Case No. 2:11-cv-225-SS |
| SHERIFF MARLIN N. GUSMAN, Orleans ) | |
| Parish Sheriff, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

The United States respectfully submits this brief pursuant to 28 U.S.C. § 517.[1]

## STATEMENT OF INTERESTS OF THE UNITED STATES

The United States has a substantial interest in, and long history of, working cooperatively with state and local governments on a range of law-enforcement priorities, including immigration. These cooperative efforts are critical to enabling the federal government to identify and remove the hundreds of thousands of aliens who violate immigration laws each year, including many thousands convicted of serious crimes, an undertaking that fulfills the Executive Branch's responsibility to enforce federal statutes and to protect public safety. Louisiana's recent enactment of Act 314, a "Prohibition on Sanctuary Policies for Illegal Immigration," represents an important

_____

[1] Pursuant to 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." Under 28 U.S.C. § 518(b), "[w]hen the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so." These statutes provide a mechanism for the United States to submit its views in cases in which the United States is not a party, and are not intended to "subject[] it to the general jurisdiction of [the] Court." *Flatow v. Islamic Republic of Iran*, 305 F.3d 1249, 1252-53 & n.5 (D.C. Cir. 2002); *see, e.g.*, *SEC v. Nacchio*, No. 05-cv-480, 2008 WL 2756941, *2 (D. Colo. July 14, 2008); *Ren-Guey v. Lake Placid 1980 Olympic Games, Inc.*, 49 N.Y.2d 771, 773 (1980) (per curiam),

decision by the State of Louisiana to ensure that federal-state immigration-enforcement cooperation occurs uniformly throughout the State. *See* 2024 La. Sess. Law Serv. Act 314 (S.B. 208) (codified at La. R.S. 33:81 *et seq.*).

The 2013 Consent Judgment in this case, which calls for permanent effect absent a change in federal or state law relating to immigration detainers, and the subsequently issued Orleans Parish Sheriff's Office's ("OPSO") Policy on U.S. Immigration and Customs Enforcement ("ICE") Procedures, represent an impediment for the State of Louisiana and its local governments to cooperate with federal immigration agencies in support of immigration enforcement. OPSO's Policy instructs its officials to decline all voluntary ICE detainer requests (unless the alien is charged with certain serious criminal offenses), prevents OPSO officials from initiating a status investigation into a detainee's immigration status, restricts ICE's ability to enter secure areas, and prevents ICE from interviewing and investigating criminal aliens in OPSO's custody.

These restrictions, which impede cooperation by local authorities with federal immigration detainer requests and the sharing of information regarding aliens in state criminal custody, are of deep concern to the United States and present serious public safety and immigration enforcement issues. For those reasons, the United States is filing this statement of interest. The United States writes specifically to address the questions of: (1) whether the Consent Judgment should be terminated pursuant to Rule 60(b)(5); (2) whether the Consent Judgment should also be terminated pursuant to the Prison Litigation Reform Act's termination-of-relief provisions; and (3) whether Louisiana's Act 314 is a valid exercise of the State's authority to promote cooperation with the federal government on immigration enforcement.

## STATEMENT OF THE CASE

### I.    STATUTORY AND REGULATORY BACKGROUND

The United States federal government "has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). This authority is based in part on the federal government's power to "establish a[] uniform Rule of Naturalization," *id.* (quoting U.S. Const. art. I, § 8, cl. 4), and in part on the federal government's inherent power as a sovereign to control and conduct relations with foreign governments, in addition to policing its borders and excluding or deporting removable aliens, *id. See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 765-66 & n.6 (1972).

Despite the federal government's broad authority over immigration, the Immigration and Nationality Act ("INA") sets forth various ways in which state and local governments can cooperate in the enforcement of federal immigration laws. *See, e.g.*, 8 U.S.C. § 1101 *et seq.* Formally, Congress has authorized the Department of Homeland Security ("DHS") to enter into cooperative agreements with states and localities. *See* 8 U.S.C. § 1357(g). Under these agreements, appropriately trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens.[2] 8 U.S.C. § 1357(g)(1)-(9). State and local officers' activities under these agreements are "subject to the direction and supervision of the [Secretary]." 8 U.S.C. § 1357(g)(3). On a more informal basis, even in the absence of a written agreement, state and local officers may "communicate with the [Secretary] regarding the immigration status of any individual," or "otherwise to cooperate with the [Secretary] in the identification, apprehension, detention, or removal of aliens not lawfully

---

[2] Agreements pursuant to 8 U.S.C. § 1357(g) are also known as 287(g) agreements. *See* "ICE's 287(g) Program," U.S. Immigration and Customs Enforcement, https://www.ice.gov/identify-and-arrest/287g (last visited March 13, 2025).

present in the United States." 8 U.S.C. § 1357(g)(10); *see also* 8 U.S.C. § 1324(c) (authorizing

state and local law-enforcement officers to make arrests for violations of the INA's prohibition

against smuggling, transporting, or harboring aliens); 8 U.S.C. § 1252c (affirming state and local

officers' authority to arrest certain felons who have unlawfully returned to the United States).

The INA sets forth an additional mechanism for state and local officers to cooperate with

the federal government by responding to requests for assistance contained in federal "immigration

detainers," including ones issued by U.S. Customs and Border Protection ("CBP") and ICE, the

components of DHS that are responsible for immigration enforcement at the border and in the

interior of the country, respectively. *See* 8 U.S.C. §§ 1226, 1357. An immigration detainer provides

notice of DHS's intent to assume custody of a removable alien detained in the custody of another

law enforcement agency and seeks state or local cooperation in that effort.[3] *See* 8 U.S.C. §§ 1226,

1357(d); 8 C.F.R. § 287.7(a), (d). A detainer asks a law enforcement agency, state, or locality to:

(1) notify DHS of the alien's release date from local custody; and (2) detain the alien for up to 48

hours beyond when the individual would be released on state charges, based on DHS's

determination that it has probable cause to believe that the individual is removable, so that DHS

can take custody of the individual in an orderly custodial setting rather than in the community. 8

C.F.R. § 287.7(a), (d). DHS detainers must be accompanied by a signed administrative warrant of

arrest issued pursuant to 8 U.S.C. §§ 1226 or 1231(a). *See City of El Cenizo v. Texas*, 890 F.3d

164, 187 (5th Cir. 2018) (noting that a detainer request must be accompanied by an administrative

---

[3] References to immigration detainers (or holds) on aliens in state or federal criminal custody can be found as early as the 1940s. *See Chung Young Chew v. Boyd*, 309 F.2d 857, 865 (9th Cir. 1962); *Slavik v. Miller*, 89 F. Supp. 575, 576 (W.D. Pa. 1950), *aff'd*, 184 F.2d 575 (3d Cir. 1950); *Ex parte Korner*, 123 P.2d 111, 112 (Cal. Ct. App. 1942). Congress first codified the authority to issue immigration detainers in 1986, as a provision of the INA. *See* Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207–48, § 1751(d) (1986) (codified at 8 U.S.C. § 1357(d)).

warrant and "evidences probable cause of removability in every instance"). DHS relies on immigration detainers to seek federal, state, and local assistance in removing the tens of thousands of removable aliens arrested for or convicted of crimes annually.

Congress recognized the validity and importance of the reciprocal exchange of information between the federal government and states and localities. *See Arizona*, 567 U.S. at 412 (noting Congress "has encouraged the sharing of information about possible immigration violations"). For instance, federal law prevents states and localities from adopting laws or policies that "prohibit[] or in any way restrict" the ability of state and local officers to cooperate with federal officials by sending and receiving "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," or maintaining and exchanging such information. 8 U.S.C. § 1373(a)-(b); *see also* 8 U.S.C. § 1644 (similar). These provisions were enacted "to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials" and the former Immigration and Naturalization Service. 3 H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep. to Welfare Reform Act, codified at 8 U.S.C. § 1644). Section 1373 additionally provides that DHS "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

## II.    CONSENT JUDGMENT AND CHANGE IN LOUISIANA LAW

This case concerns a Consent Judgment between Plaintiffs, who were previously detained aliens in OPSO custody, and Defendant, the former Orleans Parish Sheriff Marlin Gusman. *See* Consent Judgment, ECF No. 96. The Consent Judgment provides that "the Sheriff shall adopt and

implement the [OPSO] Policy on [ICE] Procedures" and states that the Judgment "has permanent effect, absent a change in federal or state law applicable to immigration detainers." *Id.* at ¶ 4. On June 21, 2013, OPSO adopted its Policy calling for cooperation with ICE, while instructing OPSO to decline all voluntary ICE detainer requests unless the aliens was charged with certain criminal offenses as specified in the Policy. *See* OPSO Policy, ECF No. 96-2. The Policy notes that "OPSO officials shall not initiate any immigration status investigation into individuals in OPSO custody or affirmatively provide information on an inmate's release date or address to ICE." *Id.* Finally, the Policy restricts ICE's ability to enter secure areas of OPSO's intake and processing centers, and limits ICE's ability to interview and investigate criminal aliens in OPSO's custody. *Id.*

In 2024, Louisiana changed state law applicable to immigration detainers by enacting Act 314, a "Prohibition on Sanctuary Policies for Illegal Immigration." 2024 La. Sess. Law Serv. Act 314 (S.B. 208). In relevant part, the Act mandates that "[a] state entity, law enforcement agency, or local governmental entity may not adopt or have in effect a sanctuary policy." La. R.S. 33:82. The Act additionally specifies that "a state entity, local governmental entity, or law enforcement agency . . . shall not prohibit or in any way restrict a law enforcement agency from taking any of the following actions with respect to information regarding an alien's immigration status." La. R.S. 33:83(B). The listed actions include:

> (1) Sending the information to or requesting, receiving, or reviewing the information from a federal immigration agency; (2) Recording and maintaining the information; (3) Exchanging the information with a federal immigration agency or another state entity, local governmental entity, or law enforcement agency; (4) Using the information to comply with an immigration detainer; or (5) Using the information to confirm the identity of a detainee by a law enforcement agency.

*Id.* Further, the Act requires "[a] law enforcement agency that has custody of a detainee subject to an immigration detainer" to perform various actions, including instructing each parish correctional facility to enter into an agreement with a federal immigration agency for the purpose of temporarily

housing detainees subject to an immigration detainer, such as an agreement pursuant to 8 U.S.C. § 1357.[4] La. R.S. 33:84(A)-(D).

Although the enactment of the Act constituted a change in state law applicable to immigration detainers, the Plaintiffs and the Defendant in this matter did not move to terminate or dissolve the Consent Judgment. On February 13, 2025, the State of Louisiana filed a motion to intervene in this matter and requested that the Consent Judgment to be terminated. *See* Motion to Intervene By State of Louisiana, ECF No. 112.

## SUMMARY OF THE ARGUMENT

I.      The Consent Judgment should be terminated pursuant to Rule 60(b)(5) because it "has been satisfied, released, or discharged" and because "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Judgment provides that it "has permanent effect, absent a change in federal or state law applicable to immigration detainers." Consent Judgment ¶ 4, ECF No. 96. Louisiana's recent change in state law applicable to immigration detainers, 2024 La. Sess. Law Serv. Act 314 (S.B. 208), satisfied the Consent Judgment's termination provision.

Moreover, applying the Consent Judgment prospectively is no longer equitable because its continued enforcement is not "supported by an ongoing violation of federal law." *Horne v. Flores*, 557 U.S. 433, 454 (2009). Plaintiffs claimed that the OPSO's policy of cooperating with ICE detainers violated their rights under the Fourth Amendment and the Fifth and Fourteenth Amendment Due Process Clauses. Compl., ECF No. 1 at 12. But the OPSO's Policy was consistent with the U.S. Constitution.

---

[4] The Bossier Parish Sheriff's Office currently is the only local office in Louisiana that has entered into a 287(g) agreement with ICE. *See* "ICE's 287(g) Program, 287(g) Participating Agencies" U.S. Immigration and Customs Enforcement, https://www.ice.gov/identify-and-arrest/287g (last visited March 13, 2025) (noting on February 28, 2025, the Bossier Parish Sheriff's Office signed their Jail Enforcement Model 287(g) agreement with ICE).

The OPSO's Policy did not violate the Fourth Amendment because: (1) federal officials may constitutionally arrest aliens based on probable cause of removability under U.S. immigration law, *El Cenizo*, 890 F.3d at 187; (2) the lawfulness of such arrests does not change when state or local officials effectuate an arrest at ICE's request, *see Virginia v. Moore*, 553 U.S. 164, 176 (2008); and (3) local officials may constitutionally rely on federal officials' probable-cause determinations, *El Cenizo*, 890 F.3d at 187–88. When the OPSO cooperated with ICE detainers, it detained aliens at the request of ICE officers, based on administrative warrants attesting to probable cause of removability, with imputed knowledge of the facts establishing probable cause. The OPSO's Policy thus was consistent with the Fourth Amendment.

The OPSO's Policy also was consistent with due process. The policy did not deprive Plaintiffs of a protected liberty interest. Furthermore, immigration detainers provide any notice and opportunity to be heard that due process principles may require.

Because continued enforcement of the Consent Judgment is not "supported by an ongoing violation of federal law," *Horne*, 557 U.S. at 454, applying the Consent Judgment prospectively "is no longer equitable," Fed. R. Civ. P. 60(b)(5). And Louisiana's enactment of Act 314 "satisfied" the Consent Judgment's termination provision. *Id.* The Consent Judgment accordingly should be terminated pursuant to Rule 60(b)(5).

II.     The Consent Judgment also should be terminated pursuant to the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(b)(1)(A) and (b)(2). The judgment is subject to termination pursuant to § 3626(b)(1)(A) because the Court entered it more than two years ago and because the State of Louisiana has moved to intervene in this proceeding and to terminate the Judgment. Section 3626(b)(2) also provides a basis to terminate the Judgment because, as far as the record reflects, the Judgment was approved or granted in the absence of the finding that

§ 3626(b)(2) requires. Moreover, given that the OPSO's policy of cooperating with immigration detainers did not violate Plaintiffs' constitutional rights, the Consent Judgment does not remain "necessary to correct a current and ongoing violation of the Federal right." 18 U.S.C. § 3626(b)(3).

III.    Louisiana Act 314 is a valid exercise of state authority. It promotes valuable cooperation with the federal government on immigration enforcement and embodies the State's permissible determination that state and local officers must cooperate with federal officials in the ways authorized by 8 U.S.C. § 1357(g)(10) and approved by the Supreme Court and the Fifth Circuit in *Arizona v. United States* and *El Cenizo v. Texas*. The Act presents no preemption concerns and is well within the cooperative authority that states and localities retain under the Constitution and applicable statutes. Louisiana enacted Act 314 to answer Congress and DHS's invitation for states and localities to cooperate in enforcing immigration law and promoting public safety. Terminating the Consent Judgment will allow the OPSO to achieve these important goals.

## **ARGUMENT**

## I.    THE CONSENT JUDGMENT SHOULD BE TERMINATED PURSUANT TO RULE 60(B)(5).

Rule 60(b)(5) authorizes a court to terminate a consent judgment under certain conditions. *Frew v. Janek*, 780 F.3d 320, 326 (5th Cir. 2015). The Rule sets out two grounds for termination that apply here: (1) "the judgment has been satisfied, released, or discharged," and (2) "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Court must construe Rule 60(b)(5) "liberally to do substantial justice." *Frew*, 780 F.3d at 327 (quoting *Johnson Waste Materials v. Marshall,* 611 F.2d 593, 600 (5th Cir. 1980)).

### A.  The Consent Judgment Has Been Satisfied, Released, or Discharged.

"Consent decrees are construed according to 'general principles of contract interpretation.'" *Frew*, 780 F.3d at 327 (quoting *Dean v. City of Shreveport*, 438 F.3d 448, 460

(5th Cir. 2006)). "The primary concern of a court in construing a written contract is to ascertain the true intentions of the parties *as expressed in the instrument.*" *Id.* at 327–28 (quoting *Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006)). The standard for assessing whether contractual terms have been satisfied is "substantial compliance." *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 318 (5th Cir. 2024).

Here, the Consent Judgment provides that "the Sheriff shall adopt and implement the [OPSO] Policy on [ICE] Procedures . . . , which has permanent effect, absent a change in federal or state law applicable to immigration detainers." Consent Judgment ¶ 4, ECF No. 96. In 2024, when Louisiana enacted Act 314, it changed state law applicable to immigration detainers. 2024 La. Sess. Law Serv. Act 314 (S.B. 208). The Act provides that "a state entity, local governmental entity, or law enforcement agency . . . shall not prohibit or in any way restrict a law enforcement agency from taking any of the following actions with respect to information regarding an alien's immigration status." La. R.S. 33:83(B). The listed actions include "[u]sing the information to comply with an immigration detainer." La. R.S. 33:83(B)(4). The Act also requires "[a] law enforcement agency that has custody of a detainee subject to an immigration detainer" to perform certain actions. La. R.S. 33:84(A).

These provisions changed state law applicable to immigration detainers. And the Consent Judgment clearly expresses the parties' intent that the OPSO's duty to implement the Policy on ICE Procedures terminates upon a change in state law applicable to immigration detainers. Because Act 314 constitutes such a change, the Judgment's termination provision "has been satisfied." Fed. R. Civ. P. 60(b)(5). The Judgment should accordingly be terminated.

**B.  The Consent Judgment Is No Longer Equitable.**

Consent decrees "are not intended to operate in perpetuity." *Chisom*, 116 F.4th at 316 (quoting *Guajardo v. Tex. Dep't of Crim. Just.*, 363 F.3d 392, 394 (5th Cir. 2004)). A "federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Id.* (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004)). The mechanism by which a court exercises such powers is Rule 60(b)(5), which authorizes a court to terminate a consent decree when "applying it prospectively is no longer equitable." A consent decree is no longer equitable "if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). The key question is whether continued enforcement is "supported by an ongoing violation of federal law." *Id.* at 454.

In their Complaint, Plaintiffs claimed that the OPSO's policy and practice of detaining aliens pursuant to immigration detainers violated their rights under the Fourth Amendment and the Fifth and Fourteenth Amendment Due Process Clauses.[5] Compl., ECF No. 1 at 12. But the OPSO's policy of cooperating with immigration detainers was consistent with the Fourth Amendment and due process principles. Continued enforcement of the Consent Judgment therefore is not supported by an ongoing violation of federal law.

---

[5] Plaintiffs also asserted state law claims for false imprisonment and negligence. Compl., ECF No. 1 at 13. But those claims are not relevant to whether continued enforcement of the Consent Judgment is "supported by an ongoing violation of federal law." *Horne*, 557 U.S. at 454. Moreover, Plaintiffs premised their state law claims on the assumption that the OPSO detained them in violation of the Fourth Amendment and due process principles. The question whether continued enforcement of the Consent Judgment is supported by an ongoing violation of state law thus turns on whether continued enforcement is supported by an ongoing violation of the Fourth Amendment or due process principles.

1. <u>The OPSO's policy of cooperating with immigration detainers was consistent with the Fourth Amendment.</u>

Three points establish that the OPSO's policy of cooperating with immigration detainers was consistent with the Fourth Amendment: (1) federal officials may constitutionally arrest aliens based on probable cause of removability under U.S. immigration law; (2) the lawfulness of such an arrest does not change when state or local officials effectuate the arrest at ICE's request; and (3) local officials may constitutionally rely on federal officials' probable-cause determinations.

First, "[i]t is undisputed that *federal* immigration officers may seize aliens based on an administrative warrant attesting to probable cause of removability." *El Cenizo*, 890 F.3d at 187 (citing *Abel v. United States*, 362 U.S. 217, 233–34 (1960)). The Fourth Amendment permits arrests based on probable cause of any legal violation, whether civil or criminal. *Id.* at 188 (collecting examples). The constitutional validity of arrests for civil violations is particularly clear in the immigration context, given the "impressive historical evidence of acceptance of the validity of statutes providing for administrative deportation arrest from almost the beginning of the Nation." *Abel*, 362 U.S. at 234. Moreover, as the Fifth Circuit has recognized, ICE policy requires that immigration detainers be accompanied by an administrative warrant on which an ICE officer certifies that probable cause of removability exists. *El Cenizo*, 890 F.3d at 187. Due to this requirement, "an ICE-detainer request evidences probable cause of removability in every instance." *Id.*

Second, when state or local officials act at the request or direction of federal officials, the Fourth Amendment permits them, like federal officers, to arrest and detain aliens based on an administrative warrant that attests to probable cause of removability. This point flows from the rule that "state restrictions do not alter the Fourth Amendment's protections." *Virginia v. Moore*, 553 U.S. 164, 176 (2008); *see, e.g.*, *Martinez-Medina v. Holder*, 673 F.3d 1029, 1036 (9th Cir.

2011) (holding that deputy sheriff did not violate the Fourth Amendment when he arrested aliens for federal immigration offenses, even though he did so in violation of state law). Given that state-law arrest limitations do not alter the scope of Fourth Amendment protections, a state or local official who acts at the direction of a federal officer may make a constitutionally valid arrest to the same extent as the federal officer could do so. *See United States v. Ovando-Garzo*, 752 F.3d 1161, 1164 (8th Cir. 2014) (collecting cases).

Third, under the collective-knowledge doctrine, an "ICE officer's knowledge may be imputed to local officials even when those officials are unaware of the specific facts that establish probable cause of removability." *El Cenizo*, 890 F.3d at 187. A local officer's compliance with an ICE detainer "constitutes a paradigmatic instance of the collective-knowledge doctrine, where the detainer request itself provides the required 'communication between the arresting officer and an officer who has knowledge of all the necessary facts.'" *Id.* at 187–88 (quoting *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007)).

These points establish that the OPSO's policy of cooperating with immigration detainers was consistent with the Fourth Amendment. When the OPSO cooperated with ICE detainers, it detained aliens at the request of ICE officers, based on administrative warrants attesting to probable cause of removability, with imputed knowledge of the facts establishing probable cause. The Fifth Circuit has upheld the constitutionally of arrests under these circumstances. *Id.* Continued enforcement of the Consent Judgment therefore is not supported by an ongoing violation of the Fourth Amendment.

2. <u>The OPSO's policy of cooperating with immigration detainers was consistent with due process.</u>

The OPSO's policy of cooperating with ICE detainers was consistent with the Fifth and Fourteenth Amendment Due Process Clauses. First, when a party raises Fourth Amendment and

due process challenges to the same nexus of events, as Plaintiffs did here, the due process claim collapses into the Fourth Amendment claim. *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see, e.g.*, *Bryant v. City of New York*, 404 F.3d 128, 135-36 (2d Cir. 2005); *Becker v. Kroll*, 494 F.3d 904, 920 (10th Cir. 2007) ("[T]he Fourth Amendment adequately protected [the detainee's] constitutional liberty interests, and she therefore has no procedural due process claim based on pre-trial deprivations of physical liberty."). Indeed, "[i]f the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment," not the "Due Process Clause." *Manuel v. City of Joliet*, 137 S. Ct. 911, 919 (2017).

Second, a due process claim cannot proceed unless the plaintiff demonstrates that he has been deprived of a protected liberty or property interest. *Edionwe v. Bailey*, 860 F.3d 287, 292 (5th Cir. 2017). And the lodging of a detainer generally has no "immediate effect upon protected liberty interests" because its subject is "not entitled to a hearing prior to the execution of the warrant or to compelled execution of the warrant" on which the detainer relies. *Heath v. U.S. Parole Comm'n*, 788 F.2d 85, 91 (2d Cir. 1986); *see Keil v. Spinella*, No. 09-3417-cv-S-RED, 2011 WL 43491, at *3 (W.D. Mo. Jan. 6, 2011) ("[A] detainer alone does not cause imprisonment or a seizure by ICE. Rather, a seizure only occurs when the agency to which the detainer was issued turns custody over to ICE."), *aff'd*, 661 F.3d 981 (8th Cir. 2011); *Nasious v. Two Unknown B.I.C.E. Agents*, 657 F. Supp. 2d 1218, 1223 (D. Colo. 2009) (holding that, because the plaintiff's detention "was not imposed by or in any way impacted by the ICE detainer," the detainer "could not, as a matter of law, constitute a restraint on or deprivation of a liberty interest upon which a due process violation could be premised"), *aff'd*, 366 F. App'x 894 (10th Cir. 2010).

The point that the lodging of a detainer does not deprive its subject of a protected liberty interest is especially true in the immigration context. Removable aliens generally lack a due process right to be free from detention during removal proceedings, at least until detention becomes prolonged. *See Misquitta v. Warden Pine Prairie ICE Processing Ctr.*, 353 F. Supp. 3d 518, 526 (W.D. La. 2018). Detention is "a constitutionally valid aspect of the deportation process" and does not impinge on a protected liberty interest. *Demore v. Kim*, 538 U.S. 510, 523 (2003). To be sure, aliens who are not subject to mandatory detention may, in their removal proceedings, challenge their detention and seek release on bond. *See, e.g.*, 8 U.S.C. § 1226(a); 8 C.F.R. §§ 236.1(c)(8), 236.1(d)(1), 1003.19. But the availability of that remedy does not create a liberty interest or a freestanding due process right to be free from immigration detention. *See Demore*, 538 U.S. at 523. And in the absence of a protected liberty interest, an alien cannot challenge his detention on due process grounds.

Finally, even if the OPSO's policy of cooperating with immigration detainers implicated detainees' protected liberty interests, Plaintiffs could not establish a due process violation because the policy did not deprive them of adequate process. Procedural due process requires only that, before a person is deprived of a protected interest, he receive "notice and an opportunity to be heard." *United States v. McKown*, 930 F.3d 721, 731 (5th Cir. 2019). Detainers provide adequate notice: the "alien must be served with a copy of [the detainer] form for the detainer to take effect." ICE Form I-247A at 1. Detainers also provide an opportunity to be heard: the detainer form encourages the detainee and the custodian to contact ICE's Law Enforcement Support Center with "any questions or concerns," or if the detainee "believe[s] [that he is] a United States citizen or the victim of a crime." *Id.* at 1–2. Nothing more is required. Thus, when a custodian serves an ICE

detainer on a detainee, the detainee receives any notice and opportunity to be heard that due process principles may require.

In sum, Plaintiffs' due process claim collapses into their Fourth Amendment claim, which fails for the reasons discussed above. *See supra*, Section I.B.1. But even if Plaintiffs could mount a freestanding due process challenge, the claim would not be viable because the fact that ICE issued detainers for them did not deprive them of a protected liberty interest and because, in any event, ICE detainer forms provide detainees with any notice and opportunity to be heard that due process principles may require. Continued enforcement of the Consent Judgment thus is not supported by an ongoing due process violation.

*      *      *

The OPSO's policy of cooperating with immigration detainers did not violate the Fourth Amendment or due process principles. Continued enforcement of the Consent Judgment therefore is not "supported by an ongoing violation of federal law." *Horne*, 557 U.S. at 454. Because such support does not exist, applying the Consent Judgment prospectively is no longer equitable. The Judgment should accordingly be terminated pursuant to Rule 60(b)(5).

## II.  THE CONSENT JUDGMENT SHOULD BE TERMINATED PURSUANT TO THE PLRA.

The Consent Judgment is also subject to termination pursuant to the PLRA's "Termination of relief" provisions. 18 U.S.C. § 3626(b). These provisions apply because "the term 'relief' . . . includes consent decrees" and because this action is "[a] civil proceeding arising under Federal law with respect to . . . the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2), (g)(9); *see* Mot. to Terminate Consent Decree, ECF No. 111-1 at 7–8.

Sections 3626(b)(2) and 3626(b)(1)(A) set out the relevant grounds for termination. Section 3626(b)(2) provides that "[an] intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." And section 3626(b)(1)(A) provides that prospective relief "shall be terminable upon the motion of any party or intervener . . . 2 years after the date the court granted or approved the prospective relief." But "[p]rospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).

Nothing in the record suggests that, before the Court entered the Consent Judgment, it made the finding described in section 3626(b)(2). Moreover, the Court entered the Judgment more than two years ago, and the State of Louisiana has moved to intervene and to terminate it. The Judgment thus is subject to termination pursuant to sections 3626(b)(2) and 3626(b)(1)(A). The limitation at section 3626(b)(3) does not apply because, for the reasons stated in section I.B, *supra*, the OPSO's policy of cooperating with immigration detainers did not violate Plaintiffs' Fourth Amendment or due process rights. The Consent Judgment thus does not remain "necessary to correct a current and ongoing violation of the Federal right" or extend "no further than necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(3).

The PLRA's termination-of-relief provisions apply to the Consent Judgment. The Judgment is subject to termination pursuant to sections 3626(b)(2) and 3626(b)(1)(A), and the

section 3626(b)(3) limitation does not apply. Accordingly, the Judgment should be terminated pursuant to sections 3626(b)(2) and 3626(b)(1)(A).

## III.    LOUISIANA'S ACT IS A VALID EXERCISE OF STATE AUTHORITY TO PROMOTE COOPERATION WITH THE FEDERAL GOVERNMENT ON IMMIGRATION ENFORCEMENT.

Louisiana's Act 314 is a valid exercise of state authority to promote cooperation with the federal government on immigration enforcement, and the Consent Judgment should be terminated to allow for the implementation of this change in state law. *See* La. R.S. 33:81-33:85. While the United States holds "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, states possess broad police powers that are not superseded "unless that was the clear and manifest purpose of Congress," *id.* at 400 (quoting *Rice*, 331 U.S. at 230). *See Chamber of Commerce of the U.S. v. Whiting*, 563 U.S. 582, 607 (2011) ("a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act"). Federal immigration law expressly contemplates that states and localities may assist the federal government with immigration enforcement, which is the type of assistance that Louisiana elected to provide through the enactment of Act 314. *See* 8 U.S.C. § 1226(a), 1357(d); *see also El Cenizo*, 890 F.3d at 176 (holding that Texas law forbidding "sanctuary city" policies was not preempted by Federal law).

Nothing in federal immigration law precludes Louisiana's law barring sanctuary city policies. In *Arizona*, the Supreme Court held that the INA "put[s] in place a system in which state officers may not make warrantless arrests of aliens based on possible removability except in specific, limited circumstances," and that the INA preempted a provision of state law that "authoriz[ed] state and local officers to engage in these enforcement activities as a general matter" without "any input from the Federal Government about whether an arrest is warranted in a

particular case." 567 U.S. at 408, 410. The Court was clear that some of the "specific, limited circumstances" in which state detention of aliens for possible removability does *not* conflict with the INA include when: (1) the state or locality enters into an agreement with the federal government to assist in the enforcement of the immigration laws, *see id*. at 408-09 (citing 8 U.S.C. § 1357(g)(1)); and (2) in the absence of such an agreement, the state or locality "cooperate[s] with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States," *id*. at 409 (quoting 8 U.S.C. § 1357(g)(10)(B)). The Court was careful to distinguish such federal-state cooperation from the state law at issue in *Arizona*, which authorized a "*unilateral* decision of state officers to arrest an alien for being removable *absent any request, approval, or other instruction from the Federal Government*." *Id*. at 410 (emphasis added). Even before *Arizona*, however, it had "never [been] held that every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* preempted by this constitutional power, whether latent or exercised." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976); *see also Miller v. United States*, 357 U.S. 301, 305-06 (1958) (lawfulness of a warrantless arrest for violation of federal criminal law by state peace officers "is to be determined by reference to state law"); *Lynch v. Cannatella*, 810 F.2d 1363, 1371 (5th Cir. 1987) ("[n]o statute precludes other federal, state, or local law enforcement agencies from taking other action to enforce this nation's immigration laws").

In *El Cenizo*, the Fifth Circuit found that Texas's law, which (like Louisiana Act 314) forbade "sanctuary city" policies throughout the state, was not preempted by federal immigration laws.[6] 890 F.3d at 176-82. The Court concluded that Texas's law, which prohibited local

---

[6] While neither party nor the State of Louisiana in its motion to intervene raised a preemption argument, the United States believes that Act 314 is a constitutionally valid use of the State's

authorities from limiting their cooperation with federal immigration enforcement and required local officers to comply with ICE detainer requests, was not subject to field preemption because federal law did not prevent states from mandating that their localities cooperate in immigration enforcement. *Id.* at 176-79. Moreover, portions of Texas law that barred local officials from limiting or preventing cooperation with ICE and other federal immigration agencies, and that required localities to promote information sharing with federal immigration agencies, were not subject to conflict preemption. *Id.* at 178-82; *see also Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963) (concluding that "conflict preemption" occurs when a party cannot comply simultaneously with state and federal law); *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 535 (5th Cir. 2013) (holding that federal law preempted a local ordinance's criminal provisions because they conflicted with federal authority to arrest and detain aliens for unlawful presence).

Act 314 reflects the State of Louisiana's permissible determination that state and local officers will cooperate with federal officials in the ways approved by *Arizona* and *El Cenizo* and authorized by 8 U.S.C. § 1357(g)(10). *See* La. R.S. 33:82-33.85. Specifically, the Act prohibits state entities, law enforcement agencies, and local governments from adopting or having sanctuary polices. La. R.S. 33:82. The Act prohibits these entities from restricting a federal immigration agency's request or exchange of information about an alien detainee and bars the entities from not complying with detainer requests. La. R.S. 33:83(B). State and local cooperation with federal government detainer requests is consistent with the INA and is not otherwise preempted because it involves the kind of cooperation envisioned by Congress and is not a "unilateral decision of state

---

authority to promote cooperation with the federal government in the shared interests of immigration enforcement and the protection of our country. *See Whiting*, 563 U.S. at 607.

officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. Indeed, a detainer is a "request . . . from the Federal Government" to a state or locality to assist the federal government's efforts to take a particular alien into custody by temporarily holding him for a short time so that the government can effectuate custody in an orderly manner. *Id.*; *see El Cenizo*, 890 F.3d at 174; 8 U.S.C. §§ 1226, 1357(d); 8 C.F.R. § 287.7(a), (d). Accordingly, cooperation with detainer requests is well within the cooperative authority that *Arizona* concluded that states and localities retain, and thus Act 314 presents no serious preemption issues. *See El Cenizo*, 890 F.3d at 176 (holding that Texas law prohibiting sanctuary city policies that did not involve express preemption also did not violate any form of implied preemption). Moreover, as noted by the Court in *El Cenizo*, federal law "'encourage[s] the sharing of information about possible immigration violations'" between the federal government and state and localities. *Id.* at 182 (quoting *Arizona*, 567 U.S. at 412). Here, the Act also presents no preemption concerns regarding its provision encouraging the sharing of immigration information and prohibiting localities from creating policies that bar or materially limit cooperation with federal immigration agencies. La. R.S. 33:83. Thus, like the State of Texas's law barring sanctuary city policies at issue in *El Cenizo*, Louisiana's Act 314 is a valid exercise of the State's authority because it involves the kind of cooperation that the INA envisions. 890 F.3d at 176-77; *see also Arizona*, 567 U.S. at 410.

Because Act 314 is an appropriate exercise of the State's authority, this Court should find that the Consent Judgment is invalid and permit the OPSO to revoke its current Policy and comply with the change in law. Louisiana enacted changes to answer Congress's and DHS's invitation to cooperate on federal immigration enforcement. For instance, detainer requests ensure the safe transfer of criminals from state to federal custody in a secure environment, rather than requiring

federal officials to make more dangerous arrests in public or private places. *See, e.g.*, "ICE's 287(g) Program," https://www.ice.gov/identify-and-arrest/287g (last visited Mar. 13, 2025) ("The 287(g) Program enhances the safety and security of our nation's communities by allowing ICE Enforcement and Removal Operations (ERO) to partner with state and local law enforcement agencies to identify and remove criminal aliens who are amenable to removal from the U.S."). Restricting detainer requests to aliens charged with certain serious crimes inappropriately limits state cooperation with the federal government. Moreover, information sharing between the federal government and state and local entities regarding immigration enforcement helps to prevent violations of the immigration laws and ensures that criminal aliens remain detained and unable to commit further crimes or present a threat to the United States. Local jurisdictions in Louisiana no longer can enforce or implement sanctuary policies as the Act bars them from doing so. *See* La. R.S. 33:85. Dissolving the invalid Consent Judgment will allow OPSO officials not only to follow state law but also to promote safety by engaging in the kind of intergovernmental cooperation envisioned by Congress and expressly permitted by the INA.

## <u>CONCLUSION</u>

The Consent Judgment is subject to termination pursuant to Rule 60(b)(5) and the PLRA's termination-of-relief provisions, 18 U.S.C. § 3626(b)(1)(A), (b)(2). The Judgment should be dissolved to allow for the implementation of Louisiana's lawful change in state law promoting cooperation with the federal government on immigration enforcement. The United States respectfully requests that the Court terminate the Consent Judgment.

Dated:  April 23, 2025

Respectfully Submitted,

MICHAEL M. SIMPSON
Acting United States Attorney

RENEE E. GOUDEAU (# 33157)
BROCK D. DUPRE (# 28563)
PETER M. MANSFIELD (# 28671)
Assistant United States Attorneys
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3047
Facsimile: (504) 680-3184
Renee.Goudeau@usdoj.gov
Peter.Mansfield@usdoj.gov
Brock.Dupre@usdoj.gov

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ANTHONY NICASTRO
Acting Director
Office of Immigration Litigation
General Litigation and Appeals Section

MATTHEW SEAMON
Senior Litigation Counsel

STEPHANIE L. GROFF
Trial Attorney

/s/ Julian M. Kurz
JULIAN M. KURZ
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 598-7283
Facsimile: (202) 305-7000
julian.m.kurz@usdoj.gov