UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARIO CACHO, ET AL. | NO.: 11-225 |
| VERSUS | DIVISION: (1) |
| SHERIFF MARLIN N. GUSMAN, ORLEANS PARISH SHERIFF | MAGISTRATE JUDGE JANIS VAN MEERVELD |

## ORDER AND REASONS

Before the Court is the Motion to Intervene filed by the State of Louisiana, by and through Attorney General Elizabeth Murrill. Rec. Doc. 112. For the reasons set forth herein, the Motion to Intervene is GRANTED. The State's proposed Motion to Terminate or Dissolve the Consent Decree (Rec. Doc. 112-3) and Memorandum in Support (Rec. Doc. 112-4) shall be entered into the record and said Motion shall be set for submission on December 10, 2025. The opposition and reply memoranda shall be due in accordance with the Local Rules.

### BACKGROUND

*The underlying dispute.*

On February 2, 2011, Plaintiffs Mario Cacho and Antonio Campo ("Plaintiffs"), filed suit against Defendant Sheriff Marlin Gusman of the Orleans Parish Sheriff's Office ("OPSO")[1] for the OPSO's alleged policy and practice of illegally detaining individuals, including Plaintiffs, beyond the 48-hours allowed under immigration detainers. Rec. Doc. 1.[2] The parties consented to

---

[1] Sheriff Gusman's term ended on May 1, 2022. Sheriff Susan Hutson was elected on December 11, 2021, and sworn into office on May 2, 2022. Rec. Doc. 127, at 4 n.3.

[2] As alleged in the Complaint, Mr. Cacho was arrested for a municipal violation of disturbing the peace, but he was held for over five months after completing the criminal sentence. Rec. Doc. 1, ¶¶ 26–32. Mr. Ocampo was arrested for misdemeanor simple battery, but he was held for over three months after completing his sentence. *Id.* ¶¶ 42–47. In

proceed before Magistrate Judge Shushan.[3] Rec. Doc. 25. The parties eventually settled and entered into a consent decree, approved and signed by Judge Shushan, which awarded monetary damages to Plaintiffs and required the OPSO to adopt and implement the Orleans Parish Sheriff's Office Policy on Immigration and Customs Enforcement Procedures attached thereto (hereinafter the "policy"). Rec. Doc. 96. The one-page policy provides:[4]

1. For purposes of this section, a voluntary Immigrations and Customs Enforcement ("ICE") detainer request shall be defined as any request, including but not limited to Form 1- 247 (also known as a "48 hour hold"), which seeks continued detention of an inmate beyond expiration of municipal, state, or federal charges, or a finding of no probable cause, or a posting of bail or parole, or a completion of a sentence, or lifting of another jurisdiction or agency's detainer, or a court ordered release. ICE criminal warrants, or any court order for continued detention shall not be considered voluntary ICE detainer requests for purposes of this section.

2. The Orleans Parish Sheriff's Office shall decline all voluntary ICE detainer requests unless the individual's charge is for one or more of the following offenses: First Degree Murder (La. R.S. 14:30); Second Degree Murder (La. R.S. 14:30.1); Aggravated Rape (La. R.S. 14:42); Aggravated Kidnapping (La. R.S. 14:44); Treason (La. R.S. 14:113); or Armed Robbery with Use of a Firearm (La. R.S. 14:64.3). If a court later dismisses or reduces the individual's charge such that the individual is no longer charged with one of the above offenses or the court recommends declining the ICE hold request, OPSO will decline the ICE hold request on that individual.

3. OPSO officials shall not initiate any immigration status investigation into individuals in OPSO custody or affirmatively provide information on an inmate's release date or address to ICE.

4. Prior to any interview pertaining to an ICE criminal investigation, ICE must notify the subject inmate's attorney, provide a reasonable opportunity for counsel to be present during the interview, and certify to OPSO that this notice and opportunity has occurred. Absent a criminal warrant or court order transferring custody, no ICE agent shall be permitted into the secure area of the Intake and Processing Center. Absent a court order, OPSO shall not allow ICE to conduct civil immigration status investigations at OPSO or otherwise interview an inmate before the detainee's first appearance.

5. Any individual who alleges a violation of the policy set forth herein may file a written

---

both cases, United States Immigration and Customs Enforcement ("ICE") had made a temporary hold request to the OPSO. *Id.* ¶¶ 29, 44.

[3] Magistrate Judge Shushan retired on July 31, 2016, and this matter has been re-assigned to the undersigned.

[4] The parties dispute exactly what the policy provides, so, for clarity, the Court includes its entirety exactly as written, without the filter of any legal advocacy.

complaint for investigation with the Orleans Parish Sheriff's Director of Intake and Processing.

Rec. Doc. 96-2. Paragraph 4 of the consent decree requires this policy "remain permanently in effect absent a change in federal or state law applicable to immigration detainers." Rec. Doc. 96, ¶ 4. The OPSO has been operating pursuant to this policy since 2013.

The Court retained jurisdiction to enforce Paragraph 4 of the consent decree and to "resolve any disputes regarding the implementation and enforcement" of it. Id. ¶8. The consent decree also requires that any dispute related to it "be submitted to mediation . . . before being brought to the Court." Id. ¶9. The mediation provisions of the parties' settlement agreement similarly provide that "any dispute related to this Consent Judgment" be submitted to the mediation process, but the agreement only explicitly describes a situation where "the Plaintiff Representatives believe the Sheriff's action violates the terms of the Consent Judgment." Rec. Doc. 96-1, ¶9.

*The new law and the State's motion to intervene.*

More than a decade later, the Louisiana Legislature drafted and passed S.B. 208, which the Governor signed into law on May 28, 2024, titled the "Prohibition on Sanctuary Policies for Illegal Immigration." *See* 2024 La. Sess. Law Serv. Act 314 (S.B. 208) (codified at La. Stat. Ann. § 33:81-33:85). The law became effective the same day. *Id.* It provides, in relevant part, that, "[a] state entity, law enforcement agency, or local governmental entity may not adopt or have in effect a sanctuary policy," and "[a] law enforcement agency shall use best efforts to support the enforcement of federal immigration law." La. Stat. Ann. §§ 33:82; 33:83.

The law includes an enforcement provision: "The attorney general, in consultation with the governor, may file suit against a local governmental entity or local law enforcement agency in the Nineteenth Judicial District for declaratory or injunctive relief for a violation of this Part." Id. § 33:85(A). If the trial court finds the local governmental entity has violated the statute, it "shall

3

enjoin the unlawful sanctuary policy." Id. § 33:85(B). "An order approving a consent decree or granting an injunction shall include written findings of fact that describe with specificity the existence and nature of the sanctuary policy that violates this Part." Id. § 33:85(C).

On February 14, 2025, in a purported response to the new law, the State of Louisiana, by and through Attorney General Elizabeth Murrill, moved to intervene in this matter. Rec. Doc. 112. As the State puts it, "[f]or the last dozen years, the Orleans Parish Sheriff's Office (OPSO) has been subject to a consent decree that effectively requires OPSO to treat its facilities as sanctuary jurisdictions from U.S. Immigration and Customs and Enforcement (ICE)." Rec. Doc. 112-1, at 1. And while the consent decree has "permanent effect," its permanency has one exception: a change in federal or state law applicable to immigration detainers. *Id.* at 2. The State now contends that Louisiana changed its law applicable to immigration detainers in 2024 pursuant to Louisiana Revised Statutes § 33:81 *et seq.*, which should have prompted the parties to move or terminate the consent decree so that the OPSO may come into compliance with state law. Yet, no party has done so. And, the State argues, Sheriff Susan Hutson has been vocal that the OPSO intends to continue complying with the consent decree. Rec. Doc. 112-1, at 2.

Thus, the State is now seeking to intervene in this matter to file a Motion to Terminate or Dissolve the Consent Decree. *See* Rec. Docs. 112-3, 112-4. The State argues that it is entitled to intervention as of right because it has an interest in protecting and enforcing its laws, that interest is being impaired and impeded by the consent decree—which it says "now sits fundamentally at odds with state law," Rec. Doc. 132, at 8—and its interests are not being adequately represented by the parties, as demonstrated by neither party moving to dissolve or modify the consent decree. In the alternative, the State seeks permissive intervention, arguing that the State's claims have a

question of law or fact in common with this litigation and the intervention would not unduly delay or prejudice the adjudication of the original parties' rights.

Plaintiffs Mario Cacho and Antonio Ocampo oppose. Rec. Doc. 127. Plaintiffs contend that the State's interest is too remote and speculative at this time to form the basis of intervention as of right, so the State does not have a "real, concrete stake" in the outcome of this litigation. And, even assuming it had an adequate interest, Plaintiffs contend that the State fails to show that such interest is being impaired or impeded because it cannot demonstrate that it lacks any practical means other than intervention to seek protection of its interest. *Id.* at 10-11; 14-16. Nor has the State demonstrated, Plaintiffs argue, that the OPSO does not adequately represent the State's interest—OPSO's failure to move to dissolve or modify by the time of the State's motion does not mean that it will not do so in the future, and such delay is warranted given the ambiguity from lawmakers as to whether the new law actually impacts the consent decree. *Id.* at 18-20. They point out, for example, various statements from lawmakers that "the bill does not conflict with any federal court mandates." *Id.* at 6 n. 8; 10 n. 10. Plaintiffs also argue that this Court should decline to grant permissive intervention because the OPSO already adequately represents the State's interest, and both Plaintiffs and the OPSO would be harmed by an increase in jail population and the diversion of OPSO resources. *Id.* at 20-22.

In reply, the State contends that it has a "legitimate interest in the continued enforceability of [its] own statutes," regardless of whether the State's intervention is related to a direct challenge to the constitutionality of a state statute or whether it is attempting to "retain[] its 'power to enact and enforce any laws.'" Rec. Doc. 132, at 3 (quoting *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277 (2022)). The State largely takes issue with the legal standards espoused by Plaintiffs. It argues that it need not prove that its intervention would eliminate the policy in

order to demonstrate an interest. *Id.* at 4. Additionally, it contends that Plaintiffs rely on a heightened standard as to adequacy of representation that is not applicable to a state entity, who "should be greeted in federal court with respect, not adverse presumptions." *Id.* at 6 (quoting *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 192 (2022)). And regardless, the State contests that it has identical interests in the case as the OPSO, *id.* at 6-7, and again argues that "the disposition of this case could impair [its] interests," *id.* at 8-11. The State also re-asserts its arguments that it should be entitled to permissive intervention in the alternative because "[t]he reality is that no tangible prejudice befalls Mr. Cacho and Mr. Ocampo specifically from the State's intervention here." *Id.* at 10.

Additionally, while Defendant OPSO did not initially file an opposition memorandum—because, in its view, "the State failed to make any factual allegations, arguments, or offer any proof consistent with the factual burden for intervention"—the OPSO sought leave to file a sur-reply to the State's reply brief, which the Court granted on April 28, 2025. Rec. Docs. 141, 143. In its sur-reply, the OPSO addressed the State's argument that "Sheriff Hutson's law enforcement interests are or may be contrary to that of the State." Rec. Doc. 143, at 2. The OPSO asserted that it "maintains that [Sheriff Hutson] has and will support the laws of the state, federal and local government in the execution of her role as Sheriff of Orleans Parish," and that "[t]o date, the State has not provided any fact to support that Sheriff Hutson has or will inadequately represented [sic] the State's interest in enforcement of local, state, and federal law." *Id.*

The Court held oral argument on the State's Motion to Intervene on April 30, 2025. The Plaintiffs and the OPSO advised the Court that they have begun the mediation process contemplated by the consent decree. Counsel for the OPSO acknowledged a need to take a look at its current policies and practices in regards to the law. Counsel asserted, though, that he was not

aware of any instances where ICE made demands to the OPSO and the OPSO would not comply. The OPSO indicated that it would "absolutely . . . contemplate" collaboration with the State during the mediation process and, at minimum, would "invite conversations" with the State regarding the same. The State, for its part, reported that it did not believe it would be bound by the mediation provision in the consent decree and did not intend to participate in the mediation process.

Whatever internal evaluation by the OPSO may have been undertaken and whatever mediation may have occurred following oral argument, it did not result in the parties seeking to enforce the consent decree in this Court as contemplated in Paragraph 9(d) of the Settlement Agreement or otherwise modify or dissolve it.

The United States of America then filed a Supplemental Statement of Interests reporting that in the last four fiscal years, the OPSO has honored only 1.2% of immigration detainers and arguing that this "disregard has caused dangerous individuals to be released into the community rather than taken into" ICE custody. Rec. Doc. 146, at 1. The attached declaration (resubmitted in compliance with 28 U.S.C. § 1746) lists statistics regarding the number of detainers submitted and honored as well as "Notable Cases in Which the OPSO Has Released Individuals Despite ICE Detainers." Rec. Doc. 148. As this was the first time anything beyond mere speculation regarding the OPSO's actions with regard to immigration had been presented to the Court, the Court ordered the parties and the State to address the brief and declaration.

The State submits that the submission of the United States shows that the OPSO's ongoing noncompliance is presently impairing the State's interests. It insists, though, that it was never required to submit affirmative proof of actual impairment to intervene. It also cites a recent campaign debate in which the current Sheriff invoked the consent decree when asked about the OPSO's policy and the state's anti-sanctuary law.

The Plaintiffs argue that the submission fails to show practical impairment because the analysis should center on the movant's ability to protect its interests, not the temporary harm to the interest itself. They argue that declaration contains inadmissible and otherwise unreliable evidence. They point out that declarant Officer Sean Braud admits that the information in the declaration is based only partially on his own personal knowledge in addition to "information that other ICE employees have provided to me in my official capacity." Further, plaintiffs say critical information is missing from the statements regarding the release of certain dangerous individuals. They submit that in over half of the highlighted cases, the State itself dropped all charges. The Plaintiffs also argue that the statement is untimely because it was submitted months after oral argument and without obtaining leave of court, yet contains no explanation for the delay.

Both the Plaintiffs and the OPSO contend that the State can sue in state court at any time to enforce its law and that, as a result, its ability to protect its interests are not impaired.

LAW AND ANALYSIS

The State seeks both intervention as of right and permissive intervention. The Court addresses each in turn.

**I.   Intervention as of Right**

A movant is entitled to intervene as of right if the movant "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED. R. CIV. P. 24(a)(2). The Fifth Circuit has articulated the following test to determine whether an intervenor may intervene as of right:

> (1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest;

> [and] (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) (quoting *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984)). A movant must satisfy each element to be entitled to intervene. *Id.* "Although the movant bears the burden of establishing its right to intervene, Rule 24 is to be liberally construed." *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014). But, to be sure, while courts favor intervention, "there is no 'broad policy' favoring intervention when the intervenor fails to meet the strictures showing intervention as of right." *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 312 (5th Cir. 2022) (Higgenbotham, J., dissenting) (citing *Texas*, 805 F.3d at 661)).

"Because Rule 24 attempts to address [a wide variety of] situations, the facts and procedural posture of each case are important, and it is often true that 'general rules and past decisions cannot provide uniformly dependable guides.'" *United States v. Texas E. Transmission Corp.*, 923 F.2d 410, 412 (5th Cir. 1991) (quoting *Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969). Indeed, the Fifth Circuit has "consistently held that (a)(2) intervention as of right must be measured by a practical rather than technical yardstick." *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 841 (5th Cir. 1975).

### A. The motion to intervene is timely

At oral argument, Plaintiffs confirmed that they did not raise or contest the issue of timing as to intervention as of right.[5] Based on the parties' agreement and the caselaw governing timeliness, the Court finds that the State's motion to intervene is timely. *See Cameron*, 595 U.S. at 279 ("Timeliness is an important consideration in deciding whether intervention should be

---

[5] There was some confusion at oral argument with counsel for the State asserting that the motion had been filed weeks after the anti-sanctuary law went into effect, although it had actually gone into effect almost nine months earlier on May 28, 2024, with no action by the State against the OPSO until the present motion, filed on February 14, 2025.

allowed, . . . but '[t]imeliness is to be determined from all the circumstances,' and 'the point to which [a] suit has progressed is . . . not solely dispositive[.]'" (quoting *NAACP v. New York*, 413 U.S. 345, 365-66 (1973))).

### B. The State has a sufficient interest in these proceedings.

"Although '[t]here is not any clear definition of the nature of the 'interest . . .'" that is required for intervention of right,' [Fifth Circuit] precedent has set guiding principles" to assist courts in determining whether a proposed intervenor has demonstrated a sufficient interest. *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 834 F.3d 562, 566 (5th Cir. 2016) (citing 7C Charles Alan Wright, et al., Federal Practice and Procedure § 1908.1 (3d ed. 2007)). The "core" of the Fifth Circuit's interest analysis asks whether the interest alleged is "legally protectable." *Id.* at 568 (citing *New Orleans Pub. Serv.*, 732 F.2d at 464). An interest "is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." *Texas*, 805 F.3d at 659. "What is important is 'whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way,' as when the party 'seeks to intervene solely for ideological, economic, or precedential reasons.'" *DeOtte v. State*, 20 F.4th 1055, 1068 (5th Cir. 2021) (quoting *Texas*, 805 F.3d at 657)). "[A] State "clearly has a legitimate interest in the continued enforceability of its own statutes,'" and "a State's opportunity to defend its laws in federal court should not be lightly cut off." *Cameron*, 595 U.S. at 277 (quoting *Maine v. Taylor*, 477 U.S. 131, 137 (1986)).

Here, Plaintiffs argue that the State does not have an interest in this litigation. They argue that because "there is no state law being challenged here," "there is nothing for the State to defend." Rec. Doc. 127, at 8. So, according to Plaintiffs, the only arguable interest the State could have is

10

its interest in "eliminating the detention policy," which, in Plaintiffs' view is "too remote and speculative" to demonstrate a "real, concrete stake" in the outcome of the litigation, because eliminating the consent decree "would not necessarily also eliminate the OPSO detention policy." *Id.* at 8-11 (citations omitted).

The State argues it has a clear interest in the continued enforceability of its own statutes. Describing the State's interest as an interest in enforcing its laws may be imprecise. The State seeks to dissolve the consent decree. If its proposed motion is successful, an order dissolving or modifying the consent decree would likely result from a finding by this Court that the OPSO policy required by the consent decree conflicts with the state anti-sanctuary law. But there appears to be no basis in the context of this litigation for this Court to enjoin OPSO from using the policy or to otherwise "enforce" the state law. Ultimately, it appears that any such injunction against OPSO would have to be issued by the Nineteenth Judicial District Court as expressly provided in the new law.

Nonetheless, the Court finds the State has a sufficient interest in this litigation to justify intervention. The State's interest is in dissolving the consent decree so that the OPSO cannot use it as a justification for refusing to modify its policy to come into compliance with the State's anti-sanctuary law. This is more than a generalized preference. To the extent the OPSO invokes the consent decree as a basis for refusing to comply with the anti-sanctuary law,[6] the State cannot enforce its law until the consent decree is modified or dissolved. While not squarely an attempt to enforce state law, its intervention is one step that is arguably necessary for it to be able to do so. The Court finds State's interest in this litigation is legally protectable.

---

[6] Conceivably the OPSO could determine on its own that the anti-sanctuary law was a change in law regarding immigration detainers that conflicts with its policy and could modify the policy, or the State might obtain an injunction from the Nineteenth Judicial District Court requiring the OPSO to end its policy and the OPSO might comply. But, as discussed further below, it appears those eventualities are not on the horizon.

### C. The state has demonstrated practical impairment.

Having satisfied the interest requirement, the State must also demonstrate that "disposition of the action may, as a practical matter, impair or impede [its] ability to protect that interest." *Texas*, 805 F.3d at 657 (citation omitted). Although the State is not required to show an actual impairment, there is some question as to whether the alleged impairment is more than theoretical. *See Brumfield*, 749 F.3d at 344 ("The impairment must be 'practical,' however, and not merely 'theoretical.'"); *id.* ("[The intervenors] do not need to establish that their interests *will* be impaired. Rather, they must demonstrate only that the disposition of the action 'may' impair or impede their ability to protect their interests."); *La Union del Pueblo Entero*, 29 F.4th at 307-07 ("[T]he [intervenors] need only show that if they cannot intervene, there is a possibility that their interest could be impaired or impeded."). At oral argument and in briefing, the OPSO insisted it would comply with all laws. No evidence was presented to support finding that the OPSO had failed to use its best efforts to support the enforcement of federal immigration law. At the time of oral argument, the State had not initiated legal action in state court to enforce the anti-sanctuary law.[7] The OPSO asserted that it was evaluating its policy vis-à-vis the State anti-sanctuary law. The OPSO and the Plaintiffs represented that they were undergoing the mediation contemplated by the consent decree and would invite the State to participate. It appeared, at one time, that the proposed intervention by the State was premature.

But time has passed. The internal evaluation by the OPSO and the mediation contemplated by the consent decree has, apparently, either not occurred or resulted in no changes. And, in a late filed submission, the United States purports to show that ICE has submitted 170 detainers to the

---

[7] There is no indication it has since done so.

OPSO between fiscal years 2022 and 2025 (including 82 in 2024 and 25 in 2025), but only two were honored.[8] While this is not conclusive evidence[9] that the OPSO is not using its best efforts to support the enforcement of federal immigration or law or that it has in effect a "sanctuary policy," it suggests that the State's interest in enforcing its anti-sanctuary law may be impaired. Additionally, the State cites news articles and a recording of a campaign debate that purportedly report statements by the Sheriff to the effect that the consent decree precludes the OPSO from complying with the anti-sanctuary law. Even disregarding these linked and unverified sources, the OPSO has conspicuously failed to take a position in this litigation on whether the anti-sanctuary law amounts to a change in state law applicable to immigration detainers such that the requirement that the OPSO policy remain permanently in effect should be lifted. The passage of time with no action by the OPSO further supports finding the possible impairment of the State's interest.

The Plaintiffs and, to a lesser extent, the OPSO argue that the availability of an enforcement mechanism (i.e., filing suit in the Nineteenth Judicial District Court) precludes a finding of practical impairment. Importantly though, this is not a "key test" as Plaintiffs claim. While the availability of relief in another forum has been a factor weighing against intervention in some cases, *e.g.*, *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 526 (5th Cir. 1994), *United States v. Louisiana*, 90 F.R.D. 358, 362 (E.D. La. 1981), in other cases the fact that denying intervention would require a party to seek relief elsewhere has weighed in favor of intervention, *e.g.*, *Bernard Parish v.*

---

[8] It is unclear why the United States failed to include this information in its original Statement of Interests, Rec. Doc. 134, filed within the set briefing schedule, considering that the vast majority of the data in the declaration concerns the time period before oral argument. Although untimely, all interested parties have been provided with an opportunity to address the declaration.

[9] As the Plaintiffs point out, the declaration includes only partial information about certain highlighted examples and does indicate instances where the State itself dropped the charges. To the extent any portion of the declaration is not based on personal knowledge as OPSO challenges, the representations of counsel for the United States are just as worthy of consideration as the statements of OPSO counsel who insisted that the OPSO would comply with all laws.

13

*Lafarge N. Am., Inc.*, 914 F.3d 969, 975 (5th Cir. 2019); *Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 868 (5th Cir. 2019).

It appears the State may not be able to obtain complete relief by either remedy. In this Court, it may be able to dissolve the consent decree but not force the OPSO to change its policy. In state court, it may have trouble enforcing the anti-sanctuary law when the OPSO can claim that its hands are tied by the federal consent decree. The Court finds that this predicament shows that the State's interest could be practically impaired if it was not allowed to intervene, a conclusion that the Court finds is no longer premature given the submissions of the United States and the State showing that it appears the OPSO may not be fully cooperating with federal immigration enforcement and that the OPSO may be relying on the consent decree to avoid compliance with the anti-sanctuary law. Additionally and as noted above, the passage of time lends support to the State's fear that OPSO will not voluntarily invoke paragraph 4 of the consent decree and modify its policy to comply with the anti-sanctuary policy law.[10] The State has shown that the disposition of this action may as a practical matter impair or impede its ability to protect its interest.

### D. The State's interests will not be adequately represented by the existing parties.

"The applicant has the burden of demonstrating inadequate representation, but this burden is 'minimal.'" *Entergy Gulf States La., L.L.C. v. U.S. E.P.A.*, 817 F.3d 198, 203 (5th Cir. 2016) (quoting *Brumfield*, 749 F.3d at 345). Although courts have recognized some instances where adequate representation is presumed (as when "one party is a representative of the absentee by law" or "when the would-be intervenor has the same ultimate objective as a party to the lawsuit") *id.*, the United States Supreme Court has made clear that "a presumption of adequate representation

---

[10] The Court does not now determine whether the consent decree must be modified or dissolved.

is inappropriate when a duly authorized state agent seeks to intervene to defend a state law." *Berger*, 597 U.S. at 197.

Here, it has become obvious that the OPSO cannot represent the State's interest. The State contends that the OPSO policy conflicts with the anti-sanctuary law and must be rescinded. Despite the text of Paragraph 4 of the consent decree, the OPSO has undertaken no action to modify or rescind the policy or seek relief from the requirements of the consent decree. Clearly the OPSO's view of the law as it applies to the consent decree is at odds with the State's view.

### E. Conclusion

The State has satisfied all factors under Rule 24(a). The Court finds the State is entitled to intervention as a matter of right to pursue it motion to dissolve or modify the consent decree.

## II. Permissive Intervention

Even when someone is not entitled to intervene as of right, a court may nonetheless permit anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1). Permissive intervention is wholly discretionary. *See New Orleans Pub. Serv.,*, 732 F.2d at 470-71 (quoting Wright & Miller, 7C Federal Practice and Procedure: Civil § 1913). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." FED. R. CIV. P. 24(b)(3). Courts should also consider "whether the intervenors are adequately represented by other parties and whether they are likely to contribute significantly to the development of the underlying factual issues." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 (5th Cir. 1989).

Having found the State is entitled to intervene as of right, the Court need not address permissive intervention.

CONCLUSION

Because the State has established that it is entitled to intervene as of right, the Motion to Intervene filed by the State of Louisiana, by and through Attorney General Elizabeth Murrill (Rec. Doc. 112) is GRANTED. The State's proposed Motion to Terminate or Dissolve the Consent Decree (Rec. Doc. 112-3) and Memorandum in Support (Rec. Doc. 112-4) shall be entered into the record and said Motion shall be set for submission on December 10, 2025. The opposition and reply memoranda shall be due in accordance with the Local Rules.

New Orleans, Louisiana, this 7th day of November, 2025.

Janis van Meerveld
United States Magistrate Judge