**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

MARIO CACHO AND ANTONIO OCAMPO,

               Plaintiffs,

v.

SHERIFF MARLIN N. GUSMAN, ORLEANS PARISH SHERIFF,

               Defendant.

CIVIL ACTION NO. 2:11-CV-225

HON. JANIS VAN MEERVELD

DIVISION (1)

**ORAL ARGUMENT REQUESTED**

**<u>PLAINTIFFS' OPPOSITION TO THE STATE'S MOTION TO
TERMINATE OR DISSOLVE THE CONSENT DECREE (ECF NO. 96)</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

ARGUMENT .............................................................................................................. 4

    I.      The Court Should Not Terminate The Consent Decree Under the PLRA............. 4

         A.      The PLRA does not apply to this overdetention challenge ....................... 4

         B.      If the PLRA applies, plaintiffs are entitled to discovery and an evidentiary hearing to determine whether termination of the consent decree is appropriate under 18 U.S.C. § 3626(b)(3). .................... 9

    II.     The Court Should Not Terminate The Consent Decree Under Rule 60(b)(5). ............................................................................................... 11

         A.      The Court should certify to the Louisiana Supreme Court important and unresolved questions of state law necessary to resolve Louisiana's request for Rule 60(b)(5) relief. ............................... 12

         B.      If the Court considers the merits of State's Rule 60(b)(5) motion, it should deny relief. .................................................................................. 13

              1.      The consent decree has not been satisfied, released, or discharged. ................................................................................. 14

              2.      The equities continue to warrant enforcement of the consent decree. ............................................................................ 17

                    a.      Because Act 314 does not apply to existing consent decrees, there is no conflict between state law and the consent decree. ......................................................... 18

                    b.      Act 314 unconstitutionally infringes principles of home rule enshrined in the Louisiana Constitution. ........ 20

                    c.      Act 314 is an invalid unfunded mandate......................... 22

                    d.      Even if Act 314 is valid and conflicts with portions of the consent decree, the parties should be granted an opportunity to confer regarding modifications in lieu of outright termination. ............................................. 23

    CONCLUSION............................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of New Orleans,*
    38 F.4th 472 (5th Cir. 2022) .............................................................................24, 25

*Banks v. York,*
    515 F. Supp. 2d 89 (D.C. 2007) .................................................................................5

*Bellevue Manor Assocs. v. United States,*
    165 F.3d 1249 (9th Cir. 1999) .................................................................................14

*Benjamin v. Jacobson,*
    172 F.3d 144 (2d Cir. 1999)......................................................................................10

*Berwanger v. Cottey,*
    178 F.3d 834 (7th Cir. 1999) ....................................................................................10

*Blue Chip Stamps v. Manor Drug Stores,*
    421 U.S. 723 (1975)...................................................................................................16

*Booth v. Churner,*
    206 F.3d 289 (3d Cir. 2000).......................................................................................8

*Borcik v. Crosby Tugs, L.L.C.,*
    656 F. App'x 681 (5th Cir. 2016) .......................................................................12, 13

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,*
    345 F.3d 347 (5th Cir. 2003) ....................................................................................15

*Bruce v. Samuels,*
    577 U.S. 82 (2016).......................................................................................................5

*Buchicchio v. LeBlanc,*
    656 F. Supp. 3d 643 (M.D. La. 2023)........................................................................4

*Cadaro v. Am. Nat'l Prop. & Cas. Co.,*
    No. CV 22-3777, 2024 WL 1116188 (E.D. La. Mar. 14, 2024)...........................15

*Chisom v. Louisiana ex rel. Landry,*
    116 F.4th 309 (5th Cir. 2024) .............................................................................14, 16

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ..................................................................................22

*City & Cnty. of San Francisco v Trump*,
   783 F. Supp. 3d 1148 (N.D. Cal. 2025) ...............................................................23

*City of El Cenizo v. Texas*,
   890 F. 3d 164 (5th Cir. 2018) ..............................................................................7

*City of New Orleans v. Bd. of Comm'rs of Orleans Levee Dist.*,
   640 So. 2d 237 (La. 1994) ...........................................................................20, 21

*Clovelly Oil Co., LLC v. Midstates Petroleum Co.*,
   112 So. 3d 187 (La. 2013) ...................................................................................17

*Cooper v. Texas Alcoholic Beverage Comm'n*,
   820 F.3d 730 (5th Cir. 2016) ..............................................................................17

*Cotton v. Certain Underwriters at Lloyd's of London*,
   831 F.3d 592 (5th Cir. 2016) ..............................................................................15

*Crittindon v. LeBlanc*,
   37 F.4th 177 (5th Cir. 2022) ............................................................................4, 10

*Dean v. City of Shreveport*,
   438 F.3d 448 (5th Cir. 2006) ..............................................................................14

*Dumas v. Jefferson Par. Sewerage Dep't*,
   No. CIV. A. 00-2993, 2001 WL 699045 (E.D. La. June 21, 2001).........................15

*Foti v. Holliday*,
   27 So. 3d 813 (La. 2009) .....................................................................................19

*Francis v. Morial*,
   455 So. 2d 1168 (La. 1984) ...........................................................................21, 22

*Free v. Abbott Lab'ys, Inc.*,
   164 F.3d 270 (5th Cir. 1999) ..............................................................................12

*Freeman v. Francis*,
   196 F.3d 641 (6th Cir. 1999) ................................................................................8

*Frew v. Janek*,
   780 F.3d 320 (5th Cir. 2015) .....................................................................14, 16, 23

*Frew v. Young*,
   992 F.3d 391 (5th Cir. 2021) ..............................................................................13

*Galarza v. Szalczyk*,
   745 F.3d 634 (3d Cir. 2014)...........................................................................22, 23

*Gonzalez v. Crosby*,
  545 U.S. 524 (2005)........................................................................................13

*Gonzalez v. United States Immigr. & Customs Enf't*,
  975 F.3d 788 (9th Cir. 2020) ........................................................................7

*Grant v. Gusman*,
  No. 17-2797, 2018 WL 3869494 (E.D. La. Aug. 14, 2018).........................4

*Grant v. Gusman*,
  No. CV 17-2797, 2021 WL 1198260 (E.D. La. Mar. 30, 2021).................10

*Greig v. Goord*,
  169 F.3d 165 (2d Cir. 1999)..........................................................................5

*Handberry v. Thompson*,
  446 F.3d 335 (2d Cir. 2006)..........................................................................8

*Hesling v. CSX Transp., Inc.*,
  396 F.3d 632 (5th Cir. 2005) .......................................................................13

*Hicks v. LeBlanc*,
  81 F.4th 497 (5th Cir. 2023) ...............................................................1, 4, 6, 7, 11

*Horne v. Flores*,
  557 U.S. 433 (2009).................................................................................17, 20

*Jackson v. Johnson*,
  475 F.3d 261 (5th Cir. 2007) .....................................................................6, 7

*Jones v. Bock*,
  549 U.S. 199 (2007)........................................................................................5

*Jones v. Gusman*,
  No. 12-cv-859 (E.D. La. June 6, 2013)........................................................25

*Kona Tech. Corp. v. S. Pacific Transp. Co.*,
  225 F.3d 595 (5th Cir. 2000) .......................................................................15

*In re Liljeberg Enters., Inc.*,
  304 F.3d 410 (5th Cir. 2002) .......................................................................17

*Lomax v. Ortiz-Marquez*,
  140 S. Ct. 1721 (2020).....................................................................................5

*Loyd v. Alabama Dep't of Corr.*,
  176 F.3d 1336 (11th Cir. 1999) ...................................................................10

*Martin v. Iowa*,
752 F.3d 725 (8th Cir. 2014) ...................................................................................8

*McNeal v. Louisiana Dep't of Pub. Safety & Corr.*,
No. CV 18-736, 2020 WL 798321 (M.D. La. Feb. 18, 2020) ...................................6

*Morales v. Chadbourne*,
793 F.3d 208 (1st Cir. 2015) ...................................................................................7

*Morial v. Smith & Wesson Corp.*,
785 So. 2d 1 (La. 2001) .................................................................................21, 22

*New Orleans Campaign For a Living Wage v. City of New Orleans*,
825 So. 2d 1098 (La. 2002) ...........................................................................20, 21

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)..................................................................................................8

*Ojo v. INS*,
106 F.3d 680 (5th Cir. 1997) ...............................................................................6, 7

*In re Pettle*,
410 F.3d 189 (5th Cir. 2005) ..................................................................................13

*Pickard v. Amazon.com, Inc.*,
No. 5:20-CV-01448, 2023 WL 8191903 (W.D. La. Nov. 27, 2023)......................13

*Police Ass'n of New Orleans v. City of New Orleans*,
616 F. Supp. 3d 549 (E.D. La. 2022).....................................................................16

*Police Jury of Calcasieu Par. v. Indian Harbor Ins. Co.*,
No. 2:24-CV-00342, 2024 WL 1545135 (W.D. La. Apr. 9, 2024) .........................13

*Polk v. Edwards*,
626 So. 2d 1128 (La. 1993) .............................................................................22, 23

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992)......................................................................................13, 17, 23

*Seth v. McDonough*,
461 F. Supp. 3d 242 (D. Md. 2020)......................................................................5, 8

*Shatteen v. JP Morgan Chase Bank, N.A.*,
519 F. App'x 320 (5th Cir. 2013) ...........................................................................16

*Smith v. Zachary*,
255 F.3d 446 (7th Cir. 2001) ...................................................................................8

*Traweek v. LeBlanc*,
 No. 21-30096, 2022 WL 2315444 (5th Cir. June 28, 2022) ....................................................4

*Tyler v. Murphy*,
 135 F.3d 594 (8th Cir. 1998) ..................................................................................................10

*United States v. Armour & Co.*,
 402 U.S. 673 (1971) ...............................................................................................................14

*United States v. United Fruit Co.*,
 22 F.3d 1095, 1994 WL 199225 (5th Cir. May 13, 1994) ......................................................16

*Wallace v. Texaco, Inc.*,
 681 F.2d 1088 (5th Cir. 1982) ................................................................................................15

*Watson v. Sheahan*,
 No. 94 C 6891, 1998 WL 708803 (N.D. Ill. Sept. 30, 1998) ...................................................6

*Wederstrandt v. Kol*,
 366 So. 3d 47 (La. 2023) ...................................................................................................18, 19

*Williams v. Block*,
 No. CIV.97-3826 WJR, 1999 WL 33542996 (C.D. Cal. Aug. 11, 1999) ...............................6

*Woodford v. Ngo*,
 548 U.S. 81 (2006) ....................................................................................................................5

**Constitutional Provisions**

La. Const. art. VI, § 4 ....................................................................................................12, 20, 21

La. Const. art. VI, § 9(B) ...........................................................................................................20

La. Const. art. VI, § 14 ..................................................................................................12, 22, 23

**Statutes**

17 U.S.C. § 513 ...........................................................................................................................18

18 U.S.C. § 3626 .......................................................................................................................4, 11

18 U.S.C. § 3626(a)(1)(A) .............................................................................................................9

18 U.S.C. § 3626(a)(1)(F) .............................................................................................................9

18 U.S.C. § 3626(b)(1)(A)(i) .........................................................................................................9

18 U.S.C. § 3626(b)(2) ...............................................................................................................10

18 U.S.C. § 3626(b)(3) ...........................................................................................9, 10, 11

18 U.S.C. § 3626(c)(1) ........................................................................................................9

18 U.S.C. § 3626(e) ......................................................................................................8, 25

18 U.S.C. § 3626(e)(2) .......................................................................................................1

18 U.S.C. § 3626(e)(3) .......................................................................................................9

18 U.S.C. § 3626(g) ...........................................................................................................6

18 U.S.C. § 3626(g)(2) ..........................................................................................1, 4, 7, 8

18 U.S.C. § 3626(g)(3) .......................................................................................................6

28 U.S.C. § 1915(h) ...........................................................................................................6

42 U.S.C. § 1983 ................................................................................................................5

42 U.S.C. § 1997e(h) .........................................................................................................6

La. R.S. 24:177(A) ...........................................................................................................18

La. R.S. 24:177(B)(2)(a) ..................................................................................................19

La. R.S. 33:81 .............................................................................................................3, 18

La. R.S. 33:81(5) ..............................................................................................................21

La. R.S. 33:81(6) ........................................................................................................18, 21

La. R.S. 33:81(6)(a) ..........................................................................................................23

La. R.S. 33:82 ......................................................................................................18, 21, 23

La. R.S. 33:83 ...................................................................................................................21

La. R.S. 33:84(A)(2) .........................................................................................................23

La. R.S. 33:85 ...................................................................................................................13

La. R.S. 40:1730.40.1 .......................................................................................................18

La. R.S. 99:42(B) ..............................................................................................................18

2025 La. Sess. Law Serv. Act 237 (H.B. 64) ...................................................................18

Pub. L. No. 104-104, Title VI, § 601, Feb. 8, 1996, 110 Stat. 143.................................18

**Regulations**

8 C.F.R. § 287.7 ...................................................................................................2

8 C.F.R. § 287.7(d) .............................................................................2, 10, 22, 23, 24

8 C.F.R. § 287.7(e)..............................................................................................23

**Rules**

Fed. R. Civ. P. 60(b) ......................................................................................13, 23

Fed. R. Civ. P. 60(b)(5)...................................................1, 11, 12, 13, 14, 15, 16, 17, 23

La. Sup. Ct. Rule 12 § 1.......................................................................................12

**Legislative Materials**

141 Cong. Rec. S14,413 (daily ed. Sept. 27, 1995).....................................................5

141 Cong. Rec. S14,418 (daily ed. Sept. 27, 1995)..................................................5, 7

141 Cong. Rec. S14,419 (daily ed. Sept. 27, 1995)....................................................7

141 Cong. Rec. S7524-26 (daily ed. May 25, 1995) ...................................................5

**Other Authorities**

Louisiana House of Representatives, Archived Video, May 2024,
   https://tinyurl.com/59mythv8.........................................................................19

Louisiana State Senate Archived Video, March 2023, https://tinyurl.com/4awrrp4f...................19

Bobbi-Jeanne Misick, *OPSO Sticks with Immigration Policy Despite New
   'Sanctuary' Ban,* VERITE NEWS (June 18, 2024),
   https://tinyurl.com/4cpm3h8u.........................................................................19

TRAC, *Trump's Ineffective Use of ICE Detainers: Numbers Jump but Few
   Produce Results* (Apr. 14, 2025), https://tinyurl.com/mwa5adp3 ...........................24

U.S. Immigration and Customs Enforcement, *Immigration Detainers* (last visited
   Dec. 9, 2025), https://tinyurl.com/uxxw35y7 ............................................................6

## INTRODUCTION

Plaintiffs Mario Cacho and Antonio Ocampo were unlawfully detained for *months* after completion of their criminal sentences because the Orleans Parish Sheriff's Office ("OPSO") had a policy of honoring expired immigration detainers. Years of litigation culminated in a court-approved consent decree pursuant to which OPSO agreed to change its policy. The State of Louisiana, which is not a party to this action, has now intervened and moves to terminate the consent decree. The State's motion should be denied.

Louisiana argues first that the Prison Litigation Reform Act ("PLRA") requires termination of the consent decree—and automatically stays the consent decree pending resolution of its motion. But the motion identifies no court in any jurisdiction to ever hold that an overdetention claim like Plaintiffs' is subject to the PLRA, notwithstanding the torrent of overdetention litigation in this Circuit. To the contrary, courts have *refused* to apply the PLRA in circumstances like this. Plaintiffs were no longer "prisoners" under the PLRA after they completed their sentences, and their suit does not implicate their "lives … in prison," 18 U.S.C. § 3626(g)(2), but instead the "*execution* of [their] release." *Hicks v. LeBlanc*, 81 F.4th 497, 506 (5th Cir. 2023). Thus, the PLRA has no role to play here, and the automatic stay provided in 18 U.S.C. § 3626(e)(2) is not in effect. Moreover, even if the PLRA applied, termination of the consent decree is not automatic; Plaintiffs are entitled to an evidentiary hearing to demonstrate the continued need for prospective relief.

Louisiana next argues that the consent decree should be terminated under Federal Rule of Civil Procedure 60(b)(5) based on Act 314, which recently amended state law on cooperation with federal immigration enforcement. Louisiana's Rule 60 challenge to the consent decree turns on important and unresolved questions of state law that warrant certification to the Louisiana Supreme Court. If the Court considers Louisiana's arguments, however, it should reject them. Act 314's sponsors repeatedly explained that the Act did not apply to the OPSO consent decree—a

conclusion confirmed by the statute's text. Moreover, Act 314 is unconstitutional, violating the home-rule and unfunded mandate provisions in the Louisiana Constitution. But even if Act 314 were valid and in conflict with the consent decree, the equities require allowing the parties to modify the consent decree to bring it into compliance instead of terminating the decree outright.

## BACKGROUND

The consent decree at issue here addresses a rampant and longstanding pattern of prolonged, unlawful detention of immigrants in Orleans Parish. In 2011, Plaintiffs filed suit against Defendant Sheriff Marlin Gusman (since replaced by Sheriff Susan Hutson) alleging federal constitutional and state tort claims following their unlawful detention in the Orleans Parish Prison for *months* after completing their sentences for minor criminal charges. *See generally* R. Doc. 1 ("Comp."). Their lawsuit focused on OPSO's policy related to "immigration holds" or "immigration detainers" issued by Immigration and Customs Enforcement ("ICE"). *See* Comp. ¶ 2; 8 C.F.R. § 287.7. Federal regulations authorize ICE to issue detainers requesting that local law enforcement agencies voluntarily "maintain custody of [immigrants in criminal custody] for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by" federal immigration officials. 8 C.F.R. § 287.7(d). Plaintiffs alleged that OPSO had a policy of "submitting" to these ICE detainers and then "holding individuals in indefinite detention … beyond [the] 48 hours" authorized by the detainer. Comp. ¶ 2. For example, after Mr. Cacho completed his sentence for a municipal violation for disturbing the peace, he was held for an additional 164 days (roughly *five months*) on an expired ICE detainer. Comp. ¶¶ 26-32. Similarly, after Mr. Ocampo completed his sentence for misdemeanor battery, he was held for an additional 91 days (about three months) pursuant to an ICE detainer. Comp. ¶¶ 42-47. Plaintiffs alleged they would have been held indefinitely had it not been for their extensive legal efforts to secure their eventual release. Comp. ¶¶ 33-38, 48-55. Plaintiffs' complaint sought damages,

2

attorney fees, a declaratory judgment that OPSO's overdetention policy was unconstitutional, and other just and proper relief. Comp. at 14.

Shortly before the scheduled trial in this action, *see* R. Doc. 81, the parties reached a proposed agreement and requested that the Court enter a consent judgment. R. Docs. 94, 95, 95-1, 95-2, 95-3. In August 2013, the Court approved and entered the consent judgment, R. Doc. 96, which incorporated the parties' settlement agreement, R. Doc. 96-1, and a revised OPSO policy on ICE detainers adopted in connection with the consent judgment, R. Doc. 96-2. The consent decree entered by the Court required OPSO to adopt and implement the revised OPSO policy to govern how OPSO cooperates with ICE. R. Doc. 96 ¶ 4. Of particular note, the consent decree requires OPSO to "decline all voluntary ICE detainer requests unless the individual's charge is for" enumerated offenses, namely murder, aggravated rape, aggravated kidnapping, treason, or armed robbery with use of a firearm. R. Doc. 96-2 ¶ 2.[1] It further requires OPSO to "not initiate any immigration status investigation into individuals in OPSO custody or affirmatively provide information on an inmate's release date or address to ICE." *Id.* ¶ 3. It also puts in place certain procedural protections, including notice and access to counsel prior to certain ICE interviews, and establishes a process for adjudicating alleged violations of the consent decree. *Id.* ¶¶ 3-4.

In 2024, the Louisiana legislature passed Act 314 (also referred to as S.B. 208), which required local law enforcement to cooperate with immigration officials, including with respect to ICE detainers, and barred local governments from adopting "sanctuary" policies limiting such cooperation. *See* La. R.S. 33:81 *et seq.; infra* 18. As discussed in more detail below (at 19), the

---

[1] The State erroneously claims that "[t]he policy requires the Sheriff to 'decline' all 'ICE *criminal warrants'* unless the detainee is being prosecuted with" certain enumerated crimes. R. Doc. 157-1 at 5 (emphasis added). But the OPSO policy required by the consent decree asserts on its face that it does not apply to "ICE criminal warrants" or "any court order for continued detention," but applies only to *voluntary ICE detainer requests*. R. Doc. 96-2 ¶¶ 1-2.

Act's sponsors repeatedly assured legislators that Act 314 did not conflict with the consent decree in this case and did not require local officials to violate any court order or judgment.

Following the passage of Act 314, the State of Louisiana sought to intervene in this matter. R. Doc. 112. On November 7, 2025, the State's motion to intervene was granted. R. Doc. 156. The State now seeks to terminate or dissolve the consent decree, partly based on the enactment of Act 314. R. Doc. 157-1 ("Mot.") at 7-11.

## ARGUMENT

### I.    The Court Should Not Terminate The Consent Decree Under the PLRA.

Louisiana first seeks to terminate the consent decree under 18 U.S.C. § 3626, a provision of the PLRA. But the PLRA does not apply to Plaintiffs' overdetention claim. *Infra* § I.A. Nor would the PLRA authorize automatic termination of the consent decree without affording Plaintiffs an evidentiary hearing to develop a record demonstrating why the consent decree satisfies the requirements of § 3626. *Infra* § I.B.

### A.    The PLRA does not apply to this overdetention challenge.

The PLRA's restrictions on prospective relief apply to "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2). Louisiana has not cited, and we are not aware of, a single case in any court applying the PLRA to an overdetention claim. This is despite "endemic" overdetention in Louisiana state prisons that has "plagued" courts in the Fifth Circuit for years with overdetention claims. *See Hicks*, 81 F.4th at 510; *see also, e.g.*, *Crittindon v. LeBlanc*, 37 F.4th 177 (5th Cir. 2022); *Traweek v. LeBlanc*, No. 21-30096, 2022 WL 2315444 (5th Cir. June 28, 2022); *Grant v. Gusman*, No. 17-2797, 2018 WL 3869494 (E.D. La. Aug. 14, 2018); *Buchicchio v. LeBlanc*, 656 F. Supp. 3d 643 (M.D. La. 2023), *aff'd*, No. 23-30116, 2024 WL 4603272 (5th Cir. Oct. 29, 2024). None of those courts have ever suggested that

overdetention claims like Plaintiffs' are subject to the PLRA. Indeed, courts in other jurisdictions have affirmatively declined to apply the PLRA to overdetention claims, whether arising under 42 U.S.C § 1983 or other federal laws. *See, e.g.*, *Seth v. McDonough*, 461 F. Supp. 3d 242, 255 n.14 (D. Md. 2020) ("[T]he PLRA does not apply to [plaintiffs'] over-detention claim[.]"); *Banks v. York,* 515 F. Supp. 2d 89, 98, 104-06, 116-19 (D.C. 2007) (applying the PLRA to a variety of claims, but not the overdetention claim).

The complete lack of authority for subjecting overdetention claims to the PLRA is unsurprising. "Congress enacted the [PLRA]" "[i]n an effort to address the large number of prisoner complaints filed in federal court." *Jones v. Bock*, 549 U.S. 199, 202 (2007); *see also Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1723 (2020) (reiterating that the PLRA is concerned with "prisoner litigation"); *Bruce v. Samuels*, 577 U.S. 82, 84 (2016) (same); *Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (same); 141 Cong. Rec. S14,418 (daily ed. Sept. 27, 1995) (statement of Sen. Hatch) ("This landmark legislation will help bring relief to a civil justice system overburdened by frivolous prisoner lawsuits."); 141 Cong. Rec. S14,413 (daily ed. Sept. 27, 1995) (statement of Sen. Dole) (commenting on the growth of complaints "filed by prisoners" and noting that "[f]rivolous lawsuits filed by prisoners tie up the courts."). Courts have recognized that the PLRA was intended to "treat[] prisoners differently from other litigants," including formerly incarcerated litigants, based on Congress's conclusion that "filing lawsuits 'has become a recreational activity for long-term residents of our prisons.'" *Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) (quoting 141 Cong. Rec. S7524-26 (daily ed. May 25, 1995) (statements by Sens. Dole and Kyl)).

While the PLRA is focused on prisoner litigation, courts throughout the country have consistently held that the PLRA's definition of "prisoner" does not even encompass those who (unlike Plaintiffs) were *lawfully* detained after the completion of their criminal sentences pursuant

to some valid *non-criminal* authority. A "prisoner" is consistently defined throughout the PLRA as "any person subject to incarceration, detention, or admission to any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law…." 18 U.S.C. § 3626(g)(3); *see also* 28 U.S.C. § 1915(h); 42 U.S.C. § 1997e(h). As relevant here, the Fifth Circuit has held that someone subject to immigration detention following completion of a criminal sentence is not a "prisoner" under the PLRA because such "detention is for a violation of immigration law rather than criminal law." *Ojo v. INS*, 106 F.3d 680, 682-83 (5th Cir. 1997) (applying the definition of "prisoner" from 28 U.S.C. § 1915(h), materially identical to that in 18 U.S.C. § 3626(g)); *see also Jackson v. Johnson*, 475 F.3d 261, 266-67 (5th Cir. 2007) (explaining that the PLRA "differentiates between 'criminal' detainees—i.e., individuals detained pursuant to an accusation or conviction of a violation of a criminal statute … —and other detainees").

It follows *a fortiori* that individuals *unlawfully* detained past their release date are not "prisoners" as that term is defined in the PLRA. *See e.g.*, *McNeal v. Louisiana Dep't of Pub. Safety & Corr.*, No. CV 18-736, 2020 WL 798321, at *11 (M.D. La. Feb. 18, 2020) (interpreting identical language in Louisiana's parallel state law); *Williams v. Block*, No. CIV.97-3826 WJR, 1999 WL 33542996, at *6 (C.D. Cal. Aug. 11, 1999); *Watson v. Sheahan,* No. 94 C 6891, 1998 WL 708803, at *3 (N.D. Ill. Sept. 30, 1998). Such is the case here. Detention *after* expiration of an ICE detainer is not simply unjustified by a criminal conviction; it lacks any legal authority whatsoever—as ICE itself recognizes. *See, e.g.*, U.S. Immigration and Customs Enforcement, *Immigration Detainers* (last visited Dec. 9, 2025), https://tinyurl.com/uxxw35y7 ("If ICE does not assume custody after 48 hours, the law enforcement agency is required to release the individual. The law enforcement agency may not lawfully hold an individual beyond the 48-hour period."); *Hicks*, 81 F.4th at 504 ("Clear as day, the government cannot hold an inmate without the legal authority to do so….").

Under the foregoing authority, once Plaintiffs completed their sentences, they were no longer "'criminal' detainees." *Jackson*, 475 F.3d at 267. They were initially held on a 48-hour ICE detainer "for a violation of immigration law rather than criminal law."[2] *Ojo*, 106 F.3d at 682. Thereafter, they remained wrongfully detained for 91 and 164 days, respectively, without *any* legal authority. In sum, because Plaintiffs' lengthy detention past their release date was no longer "pursuant to [their] … conviction of a violation of a criminal statute," *Jackson*, 475 F.3d at 267, they were not "prisoners" under the PLRA.

Similarly, while the PLRA is concerned with "the lives of persons confined in prison," 18 U.S.C. § 3626(g)(2), a claim of wrongful detention past one's lawful release date relates to the "execution of … release." *Hicks*, 81 F.4th at 506 (emphasis omitted). The PLRA's sponsors expressed concern that courts were "micromanaging [the] Nation's prisons." 141 Cong. Rec. S14,418 (daily ed. Sept. 27, 1995) (statement of Sen. Hatch). Lawmakers were focused, for example, on orders governing "how warm the food is," "how bright the lights are," and "whether there are electrical outlets in each cell." 141 Cong. Rec. S14,419 (daily ed. Sept. 27, 1995) (statement of Sen. Abraham). The consent decree here, by contrast, does not dictate the quality of life in prison but rather ensures that individuals are released when they are entitled to be. Thus,

---

[2] While Plaintiffs' suit challenged detention beyond the initial 48-hour hold, two circuits have held that holding an individual under a 48-hour ICE detainer is unlawful in the absence of an independent finding of probable cause that an individual has committed a civil immigration violation. *See e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) (stating that "the Constitution requires probable cause for the immigration detention that a detainer requests" and that keeping a plaintiff in custody after termination of her criminal sentence was a "new seizure for Fourth Amendment purposes" "that must be supported by a new probable cause justification"); *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 798 (9th Cir. 2020) (similar). The Fifth Circuit has also recognized that, "under the current [ICE detainer] scheme, seizures may occur where probable cause was lacking" in violation of the Fourth Amendment—although that court has required Fourth Amendment challenges to ICE detainers to be brought on "an as-applied, not a facial," basis. *City of El Cenizo v. Texas*, 890 F. 3d 164, 190 (5th Cir. 2018).

Plaintiffs' claims challenge a policy of unlawful detention, rather than anything about prison life. *See Seth*, 461 F. Supp. 3d at 255 n.14 (the PLRA did not apply to a challenge to "a purported policy of detaining individuals beyond the point at which they are legally entitled to release").

To the extent Louisiana argues that § 3626(g)(2) should be construed to extend to *any* litigation having the slightest effect on people confined in prison—even those entitled to release and wrongfully overdetained—that argument is unavailing. The clause defining the scope of the PLRA to include "the effects of actions by government officials on the lives of persons confined in prison" was designed to capture conduct like "[e]xcessive force," which "do[e]s not naturally fall" under the category of "conditions of confinement"—as the case Louisiana relies on recognizes. *Booth v. Churner*, 206 F.3d 289, 294-95 (3d Cir. 2000) (cited at Mot. 7), *aff'd*, 532 U.S. 731 (2001). Indeed, all the cases cited by Louisiana involve actions brought by persons challenging their experience in prison during a period of lawful incarceration; these cases do not address claims by individuals unlawfully detained beyond the end of their criminal sentence. *Booth*, 206 F.3d at 294 (excessive force); *Smith v. Zachary*, 255 F.3d 446 (7th Cir. 2001) (same); *Freeman v. Francis*, 196 F.3d 641 (6th Cir. 1999) (same); *Handberry v. Thompson*¸ 446 F.3d 335, 344 (2d Cir. 2006) (inadequate education services); *Martin v. Iowa*, 752 F.3d 725 (8th Cir. 2014) (parole proceedings prior to release). Nothing in the PLRA requires the catch-all provision in § 3626(g)(2) "to extend to the furthest stretch of its indeterminacy," *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995), as Louisiana urges. The PLRA cannot be interpreted to apply to the suits of individuals who are not prisoners and are not challenging the quality of life in prison, but rather seek to vindicate their right to timely release.

For all these reasons, Louisiana is also wrong to contend that the automatic stay in 18 U.S.C. § 3626(e) is in effect. *See* R. Doc. 161. Regardless, "[t]he court may postpone the

8

effective date of an automatic stay … for not more than 60 days for good cause." 18 U.S.C. § 3626(e)(3). While the court determines whether the PLRA applies here, plaintiffs request that the Court postpone the effective date of the automatic stay until February 5, 2026 to allow for full briefing, any necessary hearing, *see infra*, and resolution of the motion.

**B.     If the PLRA applies, plaintiffs are entitled to discovery and an evidentiary hearing to determine whether termination of the consent decree is appropriate under 18 U.S.C. § 3626(b)(3).**

Even if the Court determines that the PLRA applies to this action, Plaintiffs still would be entitled to an evidentiary hearing before the consent decree may be terminated. The PLRA requires that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs," 18 U.S.C. § 3626(a)(1)(A)—a provision that applies equally to consent decrees, *see id*. § 3626(c)(1). In addition to setting forth these front-end restrictions on relief, the PLRA also specifies processes to manage previously granted relief. For example, as relevant here, the PLRA grants states the right to intervene to seek termination of a consent decree two years after it was issued. *Id.* §§ 3626(b)(1)(A)(i), 3626(a)(1)(F).

Importantly, however, termination of prospective relief after the two-year mark is not automatic under the PLRA. Instead, the Court may preserve prospective relief if it "makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." *Id.* § 3626(b)(3).

Because the PLRA directs the court to assess *current conditions* in determining whether to terminate prospective relief or instead keep it in force, courts have recognized that the party opposing termination *must* be given the opportunity to submit additional evidence to demonstrate

that current and ongoing constitutional violations justify continued prospective relief. *See Loyd v. Alabama Dep't of Corr.*, 176 F.3d 1336, 1342 (11th Cir. 1999) ("It would read all meaning out of [§ 3626(b)(3)] to force the party opposing termination to show that the consent decree meets the requirements of § 3626(b)(3) and then not provide that party with the opportunity to present evidence on that point"); *Benjamin v. Jacobson*, 172 F.3d 144, 166 (2d Cir. 1999) ("[W]e interpret §§ 3626(b)(2) and (3), read together, to mean that, when the plaintiffs so request in response to a defendant's motion for termination, the district court must allow the plaintiffs an opportunity to show current and ongoing violations of their federal rights."); *Berwanger v. Cottey*, 178 F.3d 834, 839-40 (7th Cir. 1999) (similar); *Tyler v. Murphy*, 135 F.3d 594, 597-98 (8th Cir. 1998) (similar).

The facts of this case illustrate why a plaintiff is entitled to an evidentiary hearing to create a record as to whether "prospective relief remains necessary to correct a current and ongoing violation of the Federal right." 18 U.S.C. § 3626(b)(3); *see Loyd,* 176 F.3d at 1342 (refusing such an evidentiary hearing is an abuse of discretion). Plaintiffs' claims arise from a systematic failure to release immigrants from prison upon completion of their sentence and expiration of an ICE detainer, in violation of the Fourth and Fourteenth Amendments. While voluntary ICE detainers can authorize up to a 48-hour hold after an inmate completes his sentence, 8 C.F.R. § 287.7(d), *but see supra* 7 n.2 (discussing as-applied Fourth Amendment challenges to ICE detainers), Plaintiffs were unlawfully held for months *after* expiration of the ICE detainer. And OPSO's systemic failures to timely release immigrants subject to ICE detainers are part of a broader pattern of overdetention subject to repeated litigation in the Fifth Circuit. *See supra* 4; *see also, e.g., Crittindon*, 37 F.4th at 183 (administrative mismanagement at OPSO resulting in overdetention); *Grant v. Gusman*, No. CV 17-2797, 2021 WL 1198260, at *5-7 (E.D. La. Mar. 30, 2021) (OPSO defied judge's order to credit plaintiff for time served). The Fifth Circuit has recognized the scale

of the problem statewide, noting that "roughly one in four inmates [in Louisiana] will have been locked up past their release dates." *Hicks*, 81 F.4th at 510. Given these facts, there is substantial reason to believe that the overdetention problem at the heart of this case persists—and that continued judicial oversight of the OPSO is necessary. Accordingly, Plaintiffs are entitled to develop the record on the current extent of overdetention to demonstrate that the ongoing prospective relief in this case is warranted to correct continuing constitutional violations and for the Court to determine whether termination is appropriate under 18 U.S.C. § 3626(b)(3).

## II.    The Court Should Not Terminate The Consent Decree Under Rule 60(b)(5).

As noted above, 18 U.S.C. § 3626 is not applicable and in any event does not allow for termination of the consent decree without an evidentiary hearing. *See supra* 4-10. Louisiana argues in the alternative that the consent decree should be terminated under Federal Rule of Civil Procedure 60(b)(5), asserting that the decree conflicts with the requirements of Act 314. Mot. 9-11. Those arguments turn on important and unresolved questions of state law regarding Act 314's scope and validity that warrant certification to the Louisiana Supreme Court. *Infra* § II.A. If the Court undertakes to resolve those questions without certification, it should reject Louisiana's arguments on the merits. *Infra* § II.B. Louisiana is not a party to the consent decree and thus cannot seek dissolution of the decree on the ground that the terms of the parties' agreement "ha[ve] been satisfied, released, or discharged." Fed. R. Civ. P 60(b)(5); *infra* § II.B.1. Louisiana also cannot show that "applying [the consent decree] prospectively is no longer equitable," Fed. R. Civ. P 60(b)(5). The consent decree does not conflict with Act 314, which in any event violates multiple provisions of the Louisiana Constitution and therefore cannot be a reason for invalidating the consent decree; and even if Act 314 were valid and in conflict with the consent decree, the consent decree could be modified to bring it into compliance in lieu of termination. *Infra* § II.B.2.

**A.    The Court should certify to the Louisiana Supreme Court important and unresolved questions of state law necessary to resolve Louisiana's request for Rule 60(b)(5) relief.**

The Supreme Court of Louisiana permits "any district court of the United States" to certify … questions or propositions of [Louisiana law]" to that court when those questions "are determinative of said cause independently of any other questions involved in said case and that there are no clear controlling precedents in the decisions of the supreme court of this state." La. Sup. Ct. Rule 12 § 1. Certification is appropriate "where important state interests are at stake and the state courts have not provided clear guidance on how to proceed." *Free v. Abbott Lab'ys, Inc.*, 164 F.3d 270, 274 (5th Cir. 1999); *see also Borcik v. Crosby Tugs, L.L.C.*, 656 F. App'x 681, 684 (5th Cir. 2016), *certified question accepted,* 213 So. 3d 391 (La. 2016) (certifying question when "'no on-point precedent from the [state] Supreme Court'" existed to resolve the state-law dispute "'central to th[e] case'").

The criteria for certification are satisfied here. Louisiana's intervention in this action to terminate a consent decree that is more than a decade old makes clear that "important state interests are at stake" with respect to the interpretation and application of Act 314. *Free*, 164 F.3d at 274. And Louisiana's arguments for termination under Rule 60(b)(5) turn on a number of antecedent questions of state law as to which there is no on-point state Supreme Court precedent—in part because no Louisiana state court has *ever* interpreted Act 314. Such questions include:

- Whether Act 314 applies to pre-existing consent decrees such that OPSO's obligations under the consent decree conflict, in whole or in part, with the Act;

- Whether Act 314 is unconstitutional as an infringement of the home rule protection enshrined in Article VI, § 4 of the Louisiana Constitution; and

- Whether Act 314 is invalid under Article 6, § 14 of the Louisiana Constitution because it requires increased expenditures from local government without appropriating the requisite funds.

*See infra* 20-23 (elaborating on these arguments).

12

In the face of these questions of first impression, the Court can either "guess as to how the Louisiana Supreme Court would rule" on these consequential issues of Louisiana state law "or certify[] the question[s] to the Louisiana Supreme Court." *Pickard v. Amazon.com, Inc*., No. 5:20-CV-01448, 2023 WL 8191903, at *4 (W.D. La. Nov. 27, 2023), *certified question accepted*, 379 So. 3d 19 (La. 2019). "Given the importance" of Act 314 to the State, *Pickard*, 2023 WL 8191903, at *6, the "'central[ity]'" of these state-law questions to this case, *Borcik*, 656 F. App'x at 684, and Act 314's specific contemplation that such issues would be adjudicated in state court, *see* La. R.S. 33:85, certification is the appropriate course of action here. *See also Police Jury of Calcasieu Par. v. Indian Harbor Ins. Co*., No. 2:24-CV-00342, 2024 WL 1545135, at *2 (W.D. La. Apr. 9, 2024), *certified question accepted*, 386 So. 3d 306 (La. 2024).

### B.    If the Court considers the merits of State's Rule 60(b)(5) motion, it should deny relief.

Because "a consent decree is a final judgment," *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 391 (1992), Rule 60(b) is the vehicle to relieve a party from a consent decree, *id*. at 378-83; Fed. R. Civ. P. 60(b) (setting out conditions for such relief). "[R]elief under Rule 60(b) is considered an extraordinary remedy," *In re Pettle*, 410 F.3d 189, 191 (5th Cir. 2005) (internal quotation marks omitted), "granted only in exceptional circumstances," *Frew v. Young*, 992 F.3d 391, 397 n.10 (5th Cir. 2021) (internal quotation marks omitted). This is because Rule 60(b) "balance[s] the principle of finality of a judgment with the interest of the court in seeing that justice is done in light of all the facts." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 638 (5th Cir. 2005). "[S]trict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005) (internal quotation marks omitted). As a "limited" "exception to finality," Rule 60(b) only affords relief in select circumstances, *id*. at 529, and judgments may be "reopened only to the extent that equity requires," *Rufo*, 502 U.S. at 391.

13

Here, the State invokes Rule 60(b)(5). Mot. at 9-11. Under that Rule, a consent decree may be modified or terminated only if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *Frew v. Janek*, 780 F.3d 320, 326-27 (5th Cir. 2015). The State argues the recent Act 314 satisfies the first and third clauses of Rule 60(b)(5) and warrants relief on the grounds that the consent decree "has been satisfied, released, or discharged" and that "applying it prospectively is no longer equitable." Mot. at 9-11. Both arguments fail.

### 1.    The consent decree has not been satisfied, released, or discharged.

The first clause of Rule 60(b)(5), which authorizes relief when a judgment has been "satisfied, released, or discharged," is "almost never applied to consent decrees." *Frew*, 780 F.3d at 326-27. "The vast majority of motions for modification and termination of consent decrees, especially those involving institutional reform, invoke Rule 60(b)(5)'s third clause." *Id.* Accordingly, Fifth Circuit precedent on this clause of Rule 60(b)(5) is "understandably limited." *Chisom v. Louisiana ex rel. Landry*, 116 F.4th 309, 316 (5th Cir. 2024) (en banc). However, the Fifth Circuit has stressed that satisfaction of a consent decree under the first prong of Rule 60(b)(5) is a question of state contract law, because "consent decrees … are, at their core, contracts." *Chisolm*, 116 F.4th at 318; *see also Frew*, 780 F.3d at 327 (similar). Courts thus interpret consent decrees "by looking to 'general principles of contract interpretation.'" *Chisom*, 116 F.4th at 318 (quoting *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006)). Like contractual agreements, continued enforcement of a "consent decree to which all parties agreed" should not be easily disrupted. *Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1253 & n.4 (9th Cir. 1999). The original parties "waived [their] right to litigate" so the terms that they agreed to "must be respected." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971).

14

A foundational principle of contract law is that non-parties generally cannot enforce or upset other's contracts. *See, e.g.*, *Wallace v. Texaco, Inc.*, 681 F.2d 1088, 1090 (5th Cir. 1982) (applying Louisiana law); *Cotton v. Certain Underwriters at Lloyd's of London*, 831 F.3d 592, 594 (5th Cir. 2016) (discussing general principles of contract law limiting non-party's right to enforce a contract). Under Louisiana law, third parties do not have contractual rights and cannot sue to enforce or upset a contract unless they can demonstrate that the contract was made for their benefit. *Kona Tech. Corp. v. S. Pacific Transp. Co.*, 225 F.3d 595, 602 (5th Cir. 2000)**;** *Cadaro v. Am. Nat'l Prop. & Cas. Co.*, No. CV 22-3777, 2024 WL 1116188, at *1 n.4 (E.D. La. Mar. 14, 2024); *Dumas v. Jefferson Par. Sewerage Dep't*, No. CIV. A. 00-2993, 2001 WL 699045, at *2 (E.D. La. June 21, 2001). "Parties are presumed to be contracting for themselves," and this presumption "may be overcome only if the intent to make someone a third-party beneficiary is *clearly* written or evidenced in the contract." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 362 (5th Cir. 2003) (internal quotation marks omitted; emphasis added).

Louisiana is neither a party nor a third-party beneficiary of the consent decree. The State was not a party to the original lawsuit or the consent decree. *See* R. Docs. 1, 96. In the face of the grave constitutional violations described in the Complaint, Plaintiffs and OPSO negotiated, and the Court approved, a consent decree delineating OPSO's prospective conduct. R. Doc. 96. The "Parties" to the consent decree are Plaintiffs and the Orleans Parish Sheriff. *Id.* at 1. They are "presumed to be contracting for themselves," and there is no indication whatsoever, much less a "clearly written" one, that the State was intended to be a third-party beneficiary of the consent decree. *Bridas*, 345 F.3d at 362 (internal quotation marks omitted).

Because relief from a consent decree under the first clause of Rule 60(b)(5) is a matter of vindicating the parties' contractual rights under the "four corners" of the consent decree, *see*

15

*Chisom*, 116 F.4th at 318, and Louisiana has no contractual rights in the consent decree to enforce, Louisiana cannot obtain termination of the consent decree on the ground that the terms of the decree have been "satisfied," Fed. R. Civ. P. 60(b)(5).[3] That conclusion is consistent with "a well-settled line of authority from [the U.S. Supreme] Court establish[ing] that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975). Applying this line of authority, courts in this Circuit have long held that "non-parties do not have standing to enforce consent decrees." *Police Ass'n of New Orleans v. City of New Orleans*, 616 F. Supp. 3d 549, 557 (E.D. La. 2022) (quoting *United States v. United Fruit Co.*, 22 F.3d 1095, 1994 WL 199225, at *2 (5th Cir. May 13, 1994)); *see also Shatteen v. JP Morgan Chase Bank, N.A.*, 519 F. App'x 320, 321 (5th Cir. 2013)). Whatever interest Louisiana has in the consent decree under principles other than contract law must instead be vindicated under the third prong of Rule 60(b)(5). *See infra* 17-25.

But even if the Court were to entertain Louisiana's improper attempt to dissolve the consent decree under the first clause of Rule 60(b)(5), Louisiana's argument fails on the merits. Louisiana argues that the terms of the consent decree have been "satisfied" by the enactment of Act 314 because the consent decree provides that it has "permanent effect, absent a change in federal or state law applicable to immigration detainers." Mot. at 10 (emphasis omitted) (quoting R. Doc. 96 ¶ 4). To the extent the State argues that the parties are "released" from the consent decree upon *any* change in state or federal immigration law applicable to immigration detainers, no matter how immaterial, the text of the consent decree does not require that absurd result. *See Frew*, 780 F.3d

---

[3] The Court has recognized the State's potential interest in the case by granting intervention. R. Doc. 156. But the State's interest in certain aspects of the case, like the PLRA argument discussed above and the third clause of Rule 60(b)(5) discussed below, does not confer on the State an interest in enforcing the terms of the consent decree as a matter of contract law.

at 327-28 (when interpreting a consent decree, "[t]he primary concern of a court in construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument" (internal quotation marks and emphasis omitted)); *In re Liljeberg Enters., Inc.*, 304 F.3d 410, 443 (5th Cir. 2002) ("[U]nder Louisiana law … [a] contract must be interpreted in light of the contract's other provisions in order to give … meaning suggested by the contract as a whole."); *Clovelly Oil Co., LLC v. Midstates Petroleum Co.,* 112 So. 3d 187, 192 (La. 2013) ("Courts should refrain from construing [a] contract in such a manner as to lead to absurd consequences.").

Insofar as the State argues that the consent decree has no effect if superseded by *conflicting* federal or state law, that argument collapses into its equitable argument under the third clause of Rule 60(b)(5), *see Cooper v. Texas Alcoholic Beverage Comm'n*, 820 F.3d 730, 740-41 (5th Cir. 2016) (analyzing whether a change in law renders continued enforcement "'no longer equitable'" under the third clause of Rule 60(b)(5)), and fails for the reasons set forth below.

### 2.    The equities continue to warrant enforcement of the consent decree.

The third clause of Rule 60(b)(5) authorizes a court to grant relief when "'applying [a judgment] prospectively is no longer equitable.'" As relevant here, this provision authorizes relief "if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo*, 502 U.S. at 384). Louisiana argues that the consent decree should be terminated under this standard, asserting that Act 314 evinces the State's desire to make "[s]tate and local law enforcement agencies …. cooperate with federal immigration officials" in a way that the consent decree "outright forbids," Mot. at 11. According to Louisiana, terminating the consent decree is necessary for OPSO "to comply with state law." Mot. at 1. Louisiana is wrong to claim a conflict between the consent decree and Act 314, which does not apply to preexisting consent decrees like that here and is invalid under the state constitution in any event. But even if there were a conflict, the

appropriate solution is a tailored modification of the consent decree to bring it into compliance with Act 314, not its wholesale termination.

### a. Because Act 314 does not apply to existing consent decrees, there is no conflict between state law and the consent decree.

The Louisiana legislature chose not to include consent decrees in Act 314's sweep. Indeed, consent decrees do not appear in the Act's plain text. La. R.S. 33:81 *et seq.* The Act prohibits localities from "adopt[ing] or hav[ing] in effect a sanctuary policy," La. R.S. 33:82, defined to encompass "a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity" prohibiting enumerated forms of cooperation with federal immigration authorities. La. R.S. 33:81(6). The definition says nothing about applying to legal remedies for constitutional violations, like court-order consent decrees.

This exclusion matters. In Louisiana, "'when the legislature specifically enumerates a series of things, the legislature's omission of other items, which could have easily been included in the statute, is deemed intentional.'" *Wederstrandt v. Kol*, 366 So. 3d 47, 52 (La. 2023) (citation omitted). The Louisiana legislature knows how to tailor statutes to apply to judicial remedies and consent decrees. *See, e.g.*, 2025 La. Sess. Law Serv. Act 237 (H.B. 64) (specifying that amended statute "shall apply to any pending consent decree or any judgment").[4] Moreover, here, the legislative history reveals that the Louisiana legislature was specifically aware of the OPSO consent decree at issue. *See* La. R.S. 24:177(A) ("[T]he court shall consider the intent of the

---

[4] *See also* La. R.S. 99:42(B) (legislation in the wake of the 2010 BP oil spill specifically limiting, consistent with the governing "consent decree," Louisiana's right to collect certain assets); La. R.S. 40:1730.40.1 (addressing interaction between consent decrees and certain building regulations). Federal law further evidences that legislatures know how to create statutes that apply to consent decrees. *See, e.g.*, 17 U.S.C. § 513 (addressing the calculation of licensing fees in the copyright context for "any performing rights society subject to a consent decree"); Pub. L. No. 104-104, Title VI, § 601, Feb. 8, 1996, 110 Stat. 143 (addressing the intersection between the Telecommunications Act of 1996 and several consent decrees governing different telecommunications companies).

legislature."); La. R.S. 24:177(B)(2)(a) (in addition to text, courts should consider "[t]he occasion and necessity for the law, the circumstances under which it was enacted, concepts of reasonableness, and contemporaneous legislative history"). In fact, lawmakers explicitly considered how Act 314 would apply to consent decrees. Faced with extensive questioning on this point, Act 314's house bill manager, Representative Landry, repeatedly confirmed Act 314 would not apply to the OPSO consent decree. *See* Louisiana House of Representatives, Archived Video, May 2024, at 2:27:38-45, https://tinyurl.com/59mythv8 (denying that Act 314 would force OPSO to violate the consent decree here); *id.* at 2:29:46-2:30:07 (responding in the negative to Representative Willard's question about whether Act 314 "would require law enforcement agencies to do anything contrary to a consent decree currently in place"); *id.* at 2:30:11-2:31:00 (responding in the negative to Representative Willard's question about whether Act 314 will "require that the sheriff's office defy the federal order"). Senator Miguez, the Bill's primary author in the house, also confirmed that "in the case of New Orleans, the bill does not violate the consent decree." Louisiana State Senate Archived Video, March 2023, at 52:00-52:04, https://tinyurl.com/4awrrp4f; *see also* Bobbi-Jeanne Misick, *OPSO Sticks with Immigration Policy Despite New 'Sanctuary' Ban,* Verite News, (June 18, 2024), https://tinyurl.com/4cpm3h8u (same). These statements confirm the "presum[ption] [that] the Legislature's actions in crafting a law"—that is, in drafting Act 314 to exclude the consent decree—"were knowing and intentional," *Foti v. Holliday*, 27 So. 3d 813, 817 (La. 2009) (Guidry, J.).

The legislature's intent was plain: The text of Act 314 does not extend to consent decrees and lawmakers repeatedly confirmed as much. Because the legislature made a deliberate choice to craft Act 314 in such a way as to not apply to or displace consent decrees when it "easily" could have done so, *Wederstrandt*, 366 So. 3d at 52, there is no conflict between the Act and the consent

decree here. As a result, no "significant change … in law" arising from Act 314 renders the consent decree so "detrimental to the public interest" that it must be set aside. *Horne*, 557 U.S. at 447 (quoting *Rufo*, 505 U.S. at 384).

### b. Act 314 unconstitutionally infringes principles of home rule enshrined in the Louisiana Constitution.

There is an independent problem with Louisiana's argument that the consent decree conflicts with Act 314: The Act is unconstitutional. Article VI, § 4 of the 1974 Louisiana Constitution enshrines the foundational principle of "[l]ocal governmental autonomy or home rule," granting local governments "broad powers of immunity from control by the state legislature ... when exercising within their boundaries any legislative powers not in conflict with the 1974 state constitution." *City of New Orleans v. Bd. of Comm'rs of Orleans Levee Dist.*, 640 So. 2d 237, 242-43 (La. 1994) ("*Orleans Levee Dist.*").[5] In so doing, the Louisiana Constitution "protects home rule governments from unwarranted interference by the state." *New Orleans Campaign For a Living Wage v. City of New Orleans*, 825 So. 2d 1098, 1103 (La. 2002). Given the Constitution's "philosophy of the state-local government relationship," "home rule abilities and immunities are to be broadly construed, and any claimed exception to them must be given careful scrutiny by the courts." *Orleans Levee Dist.*, 640 So. 2d at 252.

One such exemption is the reservation of "inherent powers," like the "police power," to the State. *New Orleans Campaign For a Living Wage*, 825 So. 2d at 1103; La. Const. art. VI, § 9(B) ("Notwithstanding any provision of this Article, the police power of the state shall never be abridged."). The Louisiana Supreme Court has explained that this "reserved power cannot be

---

[5] Article VI, § 4 provides: "Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect…. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter … shall retain the powers, functions, and duties in effect when this constitution is adopted."

construed so as to destroy the limitation" imposed in Article VI, § 4 by granting the State "unlimited power to supersede home rule authority." *Orleans Levee Dist.*, 640 So. 2d at 251-52. Thus, state law may validly supplant the local law of a home-rule jurisdiction only when the state law is "reasonably necessary and designed to accomplish a purpose properly falling within the scope of the police power." *Morial v. Smith & Wesson Corp.*, 785 So. 2d 1, 15 (La. 2001). "[T]o demonstrate that the state statute is 'necessary' it must be shown that the protection of such state interest cannot be achieved through alternate means significantly less detrimental to home rule powers and rights." *Orleans Levee Dist.*, 640 So. 2d at 252. Stated otherwise, the state law's incursion on home rule may not be "entirely out of proportion to any benefit redounding to the public." *Francis v. Morial*, 455 So. 2d 1168, 1173 (La. 1984).

If the Court decides to address the validity of Act 314 rather than certifying the question to the Louisiana Supreme Court, *see supra* 12-13, it should declare the Act unconstitutional. Act 314, on its face, interferes in the affairs of "[l]ocal government entit[ies]," La. R.S. 33:81(5), by barring them from adopting certain local law enforcement policies, §§ 81(6) & 82, and mandating local government cooperation with federal immigration officers, § 83. Act 314 did not even attempt to justify the incursion on home rule by "purport[ing] to be an action taken under the state's police power." *Cf. New Orleans Campaign For a Living Wage*, 825 So. 2d at 1104-05 (law banning local minimum wage laws specifically invoking "the police powers ultimately reserved to the state by Article VI, Section 9 of the Constitution of Louisiana"). Even if the State tries to retrospectively recharacterize the Act in these terms, such an argument fails because Act 314's incursion on home-rule sweeps far more broadly than reasonably necessary to serve the state's interests, whatever they are. *See Orleans Levee Dist.*, 640 So. 2d at 252; *Francis*, 455 So. 2d at 1173. Assuming the Act applies, *but see supra* 18-20, its effect here is to prohibit local governments and law

21

enforcement agencies from complying with court-ordered consent decrees designed to remedy constitutional violations. And the Act applies indiscriminately to all ICE detainers regardless of an individual's offense: Even low-level municipal violations like Mr. Cacho's trigger the Act's provisions—including as to people whose charges are dropped or who are not convicted. That staggering sweep is "entirely out of proportion," and thus not "reasonably necessary," to effectuate any state interest. *Francis*, 455 So. 2d at 1173; *Smith & Wesson*, 785 So. 2d at 15.

### c.   Act 314 is an invalid unfunded mandate.

Act 314 is invalid for an additional reason, too. Article 6, § 14 of the Louisiana Constitution "restricts the state's power to enact legislation requiring the expenditure of funds by local political subdivisions unless certain conditions are met." *Polk v. Edwards*, 626 So. 2d 1128, 1144 (La. 1993). Thus, the State may not "require[] increased expenditures" from local governments without providing the requisite funding (or the local government's consent). La. Const. art. 6, § 14.[6]

Act 314 runs afoul of this state constitutional provision because it requires increased expenditures to detain immigrants without providing any funds to cover those costs. An ICE detainer requests that local law enforcement officers "maintain custody of [an] alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays." 8 C.F.R. § 287.7(d). While federal law does not require that local law enforcement comply with ICE detainer requests, *see City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1241 n.7 (9th Cir. 2018) (citing *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014)), Act 314 purports to ban local governments in Louisiana from refusing to "[c]omply[] with an immigration detainer" issued by ICE, La. R.S.

---

[6]  The provision provides, in relevant part: "No law … requiring increased expenditures for any purpose shall become effective within a political subdivision until approved by ordinance enacted, or resolution adopted, by the governing authority of the affected political subdivision or until, and only as long as, the legislature appropriates funds for the purpose to the affected political subdivision and only to the extent and amount that such funds are provided…."

33:81(6)(a), 82, 84(A)(2), requiring them to instead hold the subjects of those detainers for between two and five additional days. 8 C.F.R. § 287.7(d). And requiring additional detention necessarily "requir[es] increased expenditures." La. Const. art. 6 § 14. Federal regulations make clear that the U.S. government does not assume responsibility for the costs of these additional days of detention that federal law does not require. 8 C.F.R. § 287.7(e). Instead, the affected prison is left holding the bag. *See* Comp. ¶ 69; *Galarza*, 745 at 644; *City & Cnty. of San Francisco v Trump*, 783 F. Supp. 3d 1148, 1185-86 (N.D. Cal. 2025).

The costs here are not the kind of downstream and "indirect effect on a community's coffers created by economic development legislation." *Cf. Polk*, 626 So.2d at 1145 (increased expenditures following approval of construction of a casino did not implicate Article 6, § 14). Act 314 specifically and directly requires local governments to keep people in prison, thereby requiring additional expenditures of funds to detain those individuals. Because the State has not appropriated funds to cover the costs of the increased expenditures, Act 314 is not effective.

### d. Even if Act 314 is valid and conflicts with portions of the consent decree, the parties should be granted an opportunity to confer regarding modifications in lieu of outright termination.

For the reasons above, the consent decree does not conflict with Act 314 and applying the consent decree prospectively remains "equitable." Fed. R. Civ. P. 60(b)(5). But even if portions of the consent decree conflict with Act 314, in lieu of wholesale termination, the parties should be granted an opportunity to modify the consent decree to bring it into compliance with Act 314. When modifying a judgment or consent decree, Rule 60(b) is given "a liberal construction," "freeing Courts to do justice in hard cases." *Frew*, 780 F.3d at 327 (citation omitted). At the same time, revisions to a consent decree under Rule 60(b)(5) must be "suitably tailored to the changed circumstance," *Rufo*, 502 U.S. at 383, and there is no justification for terminating provisions of the consent decree that do not violate Act 314. For example, the consent decree ensures OPSO does

not *initiate* any immigration status investigations, R. Doc. 96-2 ¶ 3, a requirement which does not conflict with any provision of Act 314. It also secures detainees' right to notice and an opportunity to meet and confer with counsel, *id.* ¶ 4, which again is in perfect conformity with Act 314.

Such protections were not created in a vacuum. The consent decree responds to Plaintiffs' unlawful detention for months *after* expiration of the ICE detainer on which they were held past their release date. *See* R. Doc. 1 at ¶¶ 26-32, 42-47. Although federal regulations governing ICE detainers authorize only a 48-hour hold, *see* 8 C.F.R. § 287.7(d), it is often not practicable for ICE to assume custody within 48 hours. Nationwide, ICE has been taking custody of less than 14% of those subject to 48-hour detainers in recent months. TRAC, *Trump's Ineffective Use of ICE Detainers: Numbers Jump but Few Produce Results* (Apr. 14, 2025), https://tinyurl.com/mwa5adp3. That is why the consent decree here limited the circumstances in which OPSO would honor ICE detainers at all; prior to the consent decree, ICE detainers precipitated a cycle of overdetention with no end in sight. Nothing in Act 314 authorizes, much less requires, local law enforcement agencies to hold immigrant detainees for *more* than the 48-hour hold provided for in 8 C.F.R. § 287.7(d). Thus, if Act 314 were deemed valid and held to apply to consent decrees, the parties should be afforded the opportunity to negotiate a modification to the consent decree making clear that detainees may not be held for more than the 48-hour ICE detainer hold—and, critically, setting forth procedures to ensure compliance with this requirement.

The equities favor continued enforcement of the consent decree for another reason, too: When relief from a consent decree makes constitutional compliance harder; the Fifth Circuit is more hesitant to grant relief. *See Anderson v. City of New Orleans*, 38 F.4th 472, 480 (5th Cir. 2022). And termination of this consent decree would put detainees at risk of additional constitutional violations. Orleans Parish Prison ("OPP") conditions have been found

constitutionally deficient and are being monitored by a third party through a separate consent judgment. *See Jones v. Gusman*, No. 12-cv-859, R. Doc. 466 (E.D. La. June 6, 2013) ("*Jones*") (hereinafter, the "OPP Consent Judgment"). A U.S. Department of Justice investigation uncovered numerous constitutional violations at OPP including inadequate protection from inmate-on-inmate and staff violence, inadequate mental health care, medication mismanagement, and serious environmental and sanitation issues. *Jones* R. Docs. 14-3, 14-5. Despite the OPP Consent Judgment and multiple corrective action plans, numerous areas of non-compliance persist. *See Jones* R. Doc. 1761 at 7-11. Indeed, the Fifth Circuit recently noted that the OPP "facility remains inadequate" under "minimum constitutional standards" and rejected the City's most recent request for relief from the OPP Consent Judgment. *Anderson*, 38 F.4th at 479-80. In the absence of the consent decree at issue in *this* litigation, it is likely that detainees held pursuant to ICE detainers will be subjected to unconstitutional and dangerous conditions in the OPP for the duration of their additional detention. Moreover, detaining immigrants beyond their scheduled release date is likely to *exacerbate* the unconstitutional conditions at OPP by straining resources and increasing the prison population. Such a result is neither equitable nor constitutionally acceptable.

In sum, if *some* modification of the consent decree is necessary given Act 314, the Court should not terminate the consent decree but instead exercise its discretion to allow the parties to craft a policy that complies with the Act while also protecting the constitutional rights of detainees, whether through the consent decree's mediation process, R. Doc. 96-1 ¶ 9, or otherwise.

## CONCLUSION

The Court should postpone the effective date of any automatic stay under 18 U.S.C. § 3626(e) while it considers whether the PLRA applies here and ultimately should deny the State of Louisiana's motion.

Respectfully submitted,

*/s/ Mary Yanik*
Mary Yanik
Louisiana Bar No. 36973
**TULANE LAW CLINICS**
6329 Feret Street, Suite 130
New Orleans, LA 70118
(504) 865-5153
myanik@tulane.edu

Anisha Dasgupta (*pro hac vice* pending)
Alyssa Barnard-Yanni (*pro hac vice* pending)
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
51 West 52nd St.
New York, NY 10019
(212) 506-5000
adasgupta@orrick.com
abarnard-yanni@orrick.com

*Counsel for Plaintiffs Mario Cacho and Antonio Ocampo*

December 9, 2025