UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARIO CACHO, ET AL. | NO.: 11-225 |
| VERSUS | DIVISION: (1) |
| SHERIFF MARLIN N. GUSMAN, ORLEANS PARISH SHERIFF | MAGISTRATE JUDGE JANIS VAN MEERVELD |

ORDER AND REASONS

This lawsuit was filed in 2011 by two individuals alleging the Orleans Parish Sheriff held them in custody without lawful authority for months after the applicable hold request from the United States Immigration and Customs Enforcement ("ICE") had expired. The parties settled and the Court entered a consent decree, which required the Sheriff to enter into a policy concerning ICE detainer requests. The policy is to "remain permanently in effect absent a change in federal or state law applicable to immigration detainers."

In 2024, the State of Louisiana enacted a statute that prohibits "sanctuary" policies and requires law enforcement agencies to "use best efforts to support the enforcement of federal immigration law." The State contends that this statute amounts to a change in state law applicable to immigration detainers. The Court allowed the State to intervene to pursue the present Motion to Terminate or Dissolve the Consent Decree (Rec. Doc. 157).

The Court finds that the limitations on prospective relief imposed by the Prison Litigation Reform Act and invoked by the State are inapplicable to this lawsuit. And, while the State may be entitled to relief under Federal Rule of Civil Procedure 60, three questions of state law must first be resolved. The Court finds these questions must be decided by the Louisiana Supreme Court. Accordingly, will certify the following questions to the Louisiana Supreme Court:

1

1. Does Act 314 apply to the pre-existing consent decree at issue in this lawsuit in light of the text of the statute and the legislative history?

2. Is Act 314 invalid because it infringes on the "home rule" provisions of the Louisiana Constitution?

3. Is Act 314 invalid under Article 6, Section 14 of the Louisiana Constitution as an unfunded mandate?

The Motion to Terminate or Dissolve the Consent Decree (Rec. Doc. 157) is taken under submission pending the resolution of the preceding questions.

## Background

Federal regulations provide that an authorized immigration officer can issue a "detainer," which advises "another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien" and requests "that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a).

> Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period ***not to exceed 48 hours***, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department.

Id. § 287.7(d) (emphasis added).

Plaintiff Mario Cacho completed his sentence for disturbing the peace on August 21, 2009. Rec. Doc. 1, at 6. The Sheriff continued to hold Cacho based on the purported authority of a hold request from ICE originally made on July 31, 2009. ICE did not take custody of Cacho or issue an arrest warrant. The Sheriff held Cacho for a period of 164 days in excess of the 48 hours provided by the regulation until February 5, 2010.

Plaintiff Antonio Ocampo completed his concurrent sentence for two counts of simple battery on August 12, 2010. Sheriff Gusman continued to hold him in custody pursuant to a hold request from ICE originally made on February 23, 2010. ICE did not take custody of Ocampo or issue an arrest warrant. Ocampo remained in the Sheriff's custody for 91 days in excess of the 48 hours provided by the regulation until November 15, 2010.

Cacho and Ocampo filed suit against the Sheriff in February 2011, asserting claims for deprivation of liberty and due process violations under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution; false imprisonment; and negligence. They sought declaratory relief and money damages. The parties consented to proceed before Magistrate Judge Shushan.[1] Rec. Doc. 25. The parties eventually settled and entered into a consent decree, approved and signed by Judge Shushan, which awarded monetary damages to Plaintiffs and required the Sheriff to adopt and implement the Orleans Parish Sheriff's Office Policy on Immigration and Customs Enforcement Procedures attached thereto (hereinafter the "policy"). The one-page policy provides:

1. For purposes of this section, a voluntary Immigrations and Customs Enforcement ("ICE") detainer request shall be defined as any request, including but not limited to Form 1- 247 (also known as a "48 hour hold"), which seeks continued detention of an inmate beyond expiration of municipal, state, or federal charges, or a finding of no probable cause, or a posting of bail or parole, or a completion of a sentence, or lifting of another jurisdiction or agency's detainer, or a court ordered release. ICE criminal warrants, or any court order for continued detention shall not be considered voluntary ICE detainer requests for purposes of this section.

2. The Orleans Parish Sheriff's Office shall decline all voluntary ICE detainer requests unless the individual's charge is for one or more of the following offenses: First Degree Murder (La. R.S. 14:30); Second Degree Murder (La. R.S. 14:30.1); Aggravated Rape (La. R.S. 14:42); Aggravated Kidnapping (La. R.S. 14:44); Treason (La. R.S. 14:113); or Armed Robbery with Use of a Firearm (La. R.S. 14:64.3). If a court later dismisses or reduces the individual's charge such that the individual is no longer charged with

---

[1] Magistrate Judge Shushan retired on July 31, 2016, and this matter has been re-assigned to the undersigned.

3

   one of the above offenses or the court recommends declining the ICE hold request, OPSO will decline the ICE hold request on that individual.

3. OPSO officials shall not initiate any immigration status investigation into individuals in OPSO custody or affirmatively provide information on an inmate's release date or address to ICE.

4. Prior to any interview pertaining to an ICE criminal investigation, ICE must notify the subject inmate's attorney, provide a reasonable opportunity for counsel to be present during the interview, and certify to OPSO that this notice and opportunity has occurred. Absent a criminal warrant or court order transferring custody, no ICE agent shall be permitted into the secure area of the Intake and Processing Center. Absent a court order, OPSO shall not allow ICE to conduct civil immigration status investigations at OPSO or otherwise interview an inmate before the detainee's first appearance.

5. Any individual who alleges a violation of the policy set forth herein may file a written complaint for investigation with the Orleans Parish Sheriff's Director of Intake and Processing.

Rec. Doc. 96-2. Paragraph 4 of the consent decree requires this policy "remain permanently in effect absent a change in federal or state law applicable to immigration detainers." Rec. Doc. 96, ¶ 4. The Orleans Parish Sheriff's Office has been operating pursuant to this policy since 2013.

More than a decade later, the Louisiana Legislature drafted and passed S.B. 208, which the Governor signed into law on May 28, 2024, titled the "Prohibition on Sanctuary Policies for Illegal Immigration." *See* 2024 La. Sess. Law Serv. Act 314 (S.B. 208) (codified at La. Stat. Ann. § 33:81-33:85). The law became effective the same day. Id. It provides, in relevant part, that "[a] state entity, law enforcement agency, or local governmental entity may not adopt or have in effect a sanctuary policy" and "[a] law enforcement agency shall use best efforts to support the enforcement of federal immigration law." La. Stat. Ann. §§ 33:82; 33:83. The term "sanctuary policy" is defined as follows:

> a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity which prohibits or impedes a law enforcement agency from complying with 8 U.S.C. 1373 or which prohibits or impedes a law enforcement agency from communicating or cooperating with a federal immigration agency so as to limit that law enforcement agency in, or prohibit the agency from, any of the following:

4

        (a) Complying with an immigration detainer.
        (b) Complying with a request from a federal immigration agency to notify the agency before the release of a detainee in the custody of the law enforcement agency.
        (c) Providing a federal immigration agency access to a detainee for interview.
        …

Id. § 33:81(6).

      The State contends that the consent decree should be terminated under the Prison Litigation Reform Act ("PLRA"), which contains certain provisions concerning prospective injunctive relief. Alternatively, it argues that the consent decree should be dissolved under Federal Rule of Civil Procedure 60(b)(5) because the consent decree has been "satisfied, released, or discharged" as a result of the new law, which it says triggers the part of the consent decree that provides the policy will have "permanent effect, absent a change in federal or state law applicable to immigration detainers." Finally, it argues that applying the consent decree prospectively is no longer equitable and it is therefore subject to termination under the third clause of Rule 60(b)(5). The State insists that the public's interest is manifested by the duly enacted legislation and reflects that continued enforcement of the consent decree conflicts with the public's interest.

      Plaintiffs counter that the PLRA does not apply here because their suit does not concern prison conditions and because they challenge their detention after (not while) they were "prisoners" as defined by the PLRA. As to dissolution under Rule 60(b), they argue that the Court should certify to the Louisiana Supreme Court questions such as whether the state's new law applies to existing consent decrees like the one at issue here, whether it is unconstitutional as an infringement of Louisiana's constitutional protection of home rule, and whether the new law is invalid because it requires increased expenditures from local government without the requisite funds. If the Court does not certify these questions to the Louisiana Supreme Court, plaintiffs argue

that the consent decree cannot be dissolved as satisfied, released, or discharged because the State is not a party to the consent decree. Further, they argue that the Court should reject as absurd the State's argument that any change in law applicable to immigration detainers, no matter how immaterial, releases the Sheriff from maintaining the policy. As to the third clause of Rule 60(b)(5) allowing a court to grant relief when applying a consent decree is no longer equitable, plaintiffs insist that the equities weigh in favor of enforcing the consent decree because of the issues they propose be certified to the Louisiana Supreme Court. Finally, they argue that even if there is a conflict and the new law is valid, the parties should be allowed an opportunity to confer and modify the consent decree in lieu of termination.

## Law and Analysis

1. *The PLRA does not apply.*

The PLRA was enacted in the mid-1990s to bring a "sharp rise in prisoner litigation . . . under control." Woodford v. Ngo, 548 U.S. 81, 84 (2006). It contains provisions "requiring district courts to weed out prisoner claims that clearly lack merit," "prohibiting claims for emotional injury without prior showing of physical injury," and requiring that prisoners challenging prison conditions exhaust administrative remedies before filing suit. Id. Additionally, the statute imposes limits on prospective relief, providing as follows:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

18 U.S.C. § 3626 (a)(1)(A). An intervenor or defendant is entitled to "immediate termination of any prospective relief if the relief was approved or granted in the absence of" a finding that the relief was narrowly drawn, necessary to correct, and the least intrusive as required by § 3626

6

(a)(1)(A). Id. § 3626(b)(2). Additionally, "[i]n any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener . . . 2 years after the date the court granted or approved the prospective relief." Id. § 3626(b)(1)(i). But,

> Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3).

The statute requires the court to "promptly rule on any motion to modify or terminate prospective relief in a civil action with respect to prison conditions" and provides that "[m]andamus shall lie to remedy any failure to issue a prompt ruling on such a motion." Id. § 3626(e)(1). "Any motion to modify or terminate prospective relief made under subsection (b) shall operate as a stay during the period . . . beginning on the 30th day after such motion is filed . . . ." Id. § 3626(e)(2).

By their express terms, these requirements apply to "any civil action with respect to prison conditions," which is defined as "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." Id. § 3626(g)(2).

There is no dispute that when the Court issued the consent decree here, it did not make an explicit finding "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right" as would be required under the PLRA. Id. § 3626(a)(1)(A). Plaintiffs' position

7

is that this is irrelevant because the PLRA does not apply. They insist their suit is not "with respect to prison conditions."[2] The State insists that plaintiffs' lawsuit meets the definition of an action with respect to prison conditions because the Sheriff's actions in submitting to ICE hold requests allegedly resulted in indefinite detention, which affected the plaintiffs' lives. The State thus focuses on the second clause of the definition: "any civil proceeding arising under Federal law with respect to . . . the effects of actions by government officials on the lives of persons confined in prison." Id. § 3626 (g)(2).

Only one case has been submitted that is directly on point. In Seth v. McDonough, a district court found that the PLRA did not apply to plaintiffs' over-detention claim because the court did "not view that claim as challenging the conditions of their confinement, but rather a purported policy of detaining individuals beyond the point at which they are legally entitled to release." 461 F. Supp. 3d 242, 255 n.14 (D. Md. 2020).[3] This is the better view.

The analysis of the Third Circuit Court of Appeals in Booth v. Churner, a case cited by the State, is instructive. The Booth court explained that the "conditions of confinement clause" of

---

[2] While the prospective relief provisions of the PLRA at issue here concern certain types of civil actions, other provisions of the PLRA revolve around the term "prisoner" and the plaintiff's status as an incarcerated person. For example, the *in forma pauperis* provisions of the PLRA impose certain requirements concerning fees to be paid by a prisoner and barring a prisoner from bringing a civil action if "the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g). The Fifth Circuit has held that these provisions do not apply to immigration detainees because they are not "prisoners" within the meaning of the PLRA. Ojo v. I.N.S., 106 F.3d 680, 682 (5th Cir. 1997). The PLRA also provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Fifth Circuit has held that *former* prisoners are not required to exhaust remedies under the PLRA. E.g., Bernal v. Bexar Cnty., 757 F. App'x 316, 319–20 (5th Cir. 2018).

[3] The plaintiffs also cite Banks v. York, where the court applied the requirements of the PLRA to plaintiff's Eighth Amendment challenges to the lack of reading material and a recreational budget at the jail, the commissary's failure to stock certain items like lotion and hair oil, his exposure to the stench created by regular sewage backups, and the jail's use of bunkbeds without ladders, but did not apply the PLRA's requirements to his claim challenging the jail's miscalculation of his sentence which resulted in his detention for 39 days past the day he should have been released. 515 F. Supp. 2d 89, 105 (D.D.C. 2007). But in Banks, it appears no party argued that the PLRA applied to the over-detention claims, and the Court did not explain its reasoning for not doing so.

the "prison conditions" definition encompasses "complaints such as those regarding cell overcrowding, poor prison construction, inadequate medical facilities, and incomplete law libraries." 206 F.3d 289, 294 (3d Cir. 2000). As to "the effects of actions by government officials on the lives of persons confined in prison" clause, the court held that it refers to "civil actions ranging from excessive force actions . . . to actions 'with respect to' a prison official's decision not to make basic repairs in the prison, or intentionally to deny a prisoner food, heating, or medical attention." Id. at 294-95. The State hooks into the Booth court's conclusion that "[a]ll of these actions affect the lives of prisoners similarly: They make their lives worse." Id. at 295. In context, though, it is clear the Booth court was concerned with complaints by an incarcerated person about their day-to-day experience in prison (experiencing hunger when denied food, experiencing cold when denied heat, experiencing health problems when denied medical care, experiencing injury when subjected to beating), not the possibility that they had been held unlawfully in excess of their sentence.

The Booth court's interpretation of the definition of "prison conditions" makes common sense. In contrast, the State's proposal divorces the definition of "prison conditions" entirely from the plain meaning of the words "prison conditions." The State would seem to include any government action that impacts a person confined in prison—but had that been the intent of Congress, it would have said so. The inclusion of "lives of" in the definition must have meaning. Instead of over-stretching the definition, the more logical course is to understand an action affecting the "lives of persons confined in prison" as an action impacting the experience and/or quality of the prisoners' lives in prison, and not the mere fact that they are there.

Notably, the State does not cite a single case where the prospective relief limitations of the PLRA were applied to an over-detention challenge. Instead, almost every case cited by the State

9

interprets the effects on persons confined in prison clause as applying to actions that impact a person's experience in prison. See Smith v. Zachary, 255 F.3d 446, 449 (7th Cir. 2001) (finding the plaintiff's claim challenging his alleged assault by prison guards fell under the second clause as a suit arising "from the 'effects of actions by government officials on the lives of persons confined in prison.'" (quoting 18 U.S.C. § 3626(g)(2)); Freeman v. Francis, 196 F.3d 641, 644 (6th Cir. 1999) (holding that "prison conditions" under the PLRA includes claims of excessive force); Handberry v. Thompson, 446 F.3d 335, 344 (2d Cir. 2006) (holding that a challenge to the adequacy of defendants' provision of educational services concerned the effects of actions by government officials on the lives of persons confined to prison as provided by the PLRA).[4]

And as the plaintiffs point out, this circuit has seen no shortage of claims under 42 U.S.C. § 1983 challenging over-detention, but none have applied the requirements of the PLRA. E.g., Hicks v. LeBlanc, 81 F.4th 497, 501 (5th Cir. 2023) (alleging unlawful detention by Louisiana Department of Public Safety and Corrections (DPSC) 60 days after expiration of prison sentence); Crittindon v. LeBlanc, 37 F.4th 177, 181 (5th Cir. 2022) (alleging that "DPSC officials, in violation of the Fourteenth Amendment, looked away from the administrative failure they knew was leaving prisoners in jail who had served their sentences"); Traweek v. LeBlanc, No. 21-30096, 2022 WL 2315444, at *1 (5th Cir. June 28, 2022) (challenging his detention by DPSC for 20 days beyond his release date); see Grant v. Gusman, No. CV 17-2797, 2018 WL 3869494, at *1 (E.D. La. Aug. 14, 2018) (challenging his detention by DPSC for 27 days after being sentenced to time served); Buchicchio v. LeBlanc, 656 F. Supp. 3d 643, 649 (M.D. La. 2023) (alleging DPSC "unlawfully

---

[4] The State also cites Martin v. Iowa, where the Eighth Circuit held that plaintiff's claim that his purported right to a personal interview during the parole process was an action with respect to prison conditions and subject to the requirements of the PLRA. 752 F.3d 725, 726 (8th Cir. 2014). This case seems to stretch the definition of an effect "on the lives of persons confined in prison" beyond a commonsense understanding of a prison condition. Nonetheless, the parole procedures being challenged in the Martin case affected the prisoner's experience in prison as opposed to resulting in allegedly illegal confinement.

delayed his release for twelve weeks after the expiration of his sentence"). While the State is correct that these all appear to be lawsuits for damages and not demands for prospective relief, the present lawsuit also began with a demand for declaratory relief and damages. Rec. Doc. 1, at 14. There is, as of yet, no indication that any of these over-detention cases has even considered imposing any of the PLRA's requirements.

Additionally, the explicit exclusion of "habeas corpus proceedings challenging the fact or duration of confinement in prison" from the definition of "any civil action with respect to prison conditions" makes clear that prison conditions means conditions in the prison and not the lawfulness of detention.[5] Moreover, while it might make some sense to impose limitations on prospective relief like those in the PLRA to any prospective relief purporting to indefinitely bind an arm of the state regardless of the subject matter, it is obvious that the PLRA does not extend that far.

Further, this plain interpretation of the statutory text is consistent with legislative history cited by the plaintiffs. Senator Hatch, for example, observed that 24 correctional facilities had been put under court-ordered population caps. 152 Cong. Rec. S14418 (09/27/1995). He explained "[w]hile prison conditions that actually violate the Constitution should not be allowed to persist, I believe that the courts have gone too far in micromanaging our Nation's prisons." Id. Senator Kyl observed that "[f]ederal prison lawsuits have risen from 2,000 in 1970 to 39,000 in 1994" and explained that "[p]risoners file free lawsuits in response to almost any perceived slight or inconvenience—being served chunky instead of creamy peanut butter, for instance, or being denied the use of a Gameboy video game." Id. Senator Abraham, addressing the legislation's restrictions on "court-ordered remedies in prison conditions cases," observed that judicial decrees

---

[5] The fact that § 1983 claims by former prisoners challenging unlawful detention were not explicitly excluded reflects the fact that the entirety of the PLRA is focused on suits by prisoners—not former prisoners.

11

in Michigan resulted in federal courts monitoring "how warm the food is," "how right the lights are," "whether there are electrical outlets in each cell," "whether windows are inspected and up to code," whether prisoners' hair is cut only by licensed barbers," and "whether air and water temperatures are comfortable." Id. S14419. He expressed his opinion that "criminals, while they must be accorded their constitutional rights, deserve to be punished" and "their lives should, on the whole, be describable by the old concept known as 'hard time.'" Id. He complained that courts had been "interfering with the fulfilment of this punitive function" and the proposed legislation would "return sanity and State control to our prison systems." Id.

The Court finds that a civil action like this one, by individuals who are no longer in prison and seek relief for being detained beyond their lawful period of incarceration is not a "civil action with respect to prison conditions." Therefore, the restrictions on prospective relief imposed by the PLRA are inapplicable to the plaintiffs' claims in this lawsuit.

2. *Termination of Consent Decrees Pursuant to Rule 60*

Both the United States Supreme Court and the Fifth Circuit have recognized some of the issues raised by longstanding "institutional reform injunctions." Consent decrees implicate federalism concerns because they impact "areas of core state responsibility." Horne v. Flores, 557 U.S. 433, 448 (2009); see Chisom v. Louisiana ex rel. Landry, 116 F.4th 309, 316–17 (5th Cir. 2024). They often "remain in force for many years, and the passage of time frequently brings about changed circumstances . . . ." Horne, 557 U.S. at 448. Sometimes officials agree to decrees that "go well beyond what is required by federal law," and years later, such injunctions "bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" Id. at 449 (quoting Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 441 (2004)). Thus, the Supreme Court instructs that "[t]he

federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." Frew, 540 U.S. at 442.

> It can do so pursuant to Federal Rule of Civil Procedure 60(b)(5), which provides:
>
> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding [where] the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable.

Fed. R. Civ. P. 60(b)(5). This Rule applies to consent decrees, like other judgments. Frew v. Janek, 780 F.3d 320, 326 (5th Cir. 2015). "The vast majority of motions for modification and termination of consent decrees, especially those involving institutional reform, invoke Rule 60(b)(5)'s third clause." Id. at 327. Here, though, the State invokes not only the third, "no longer equitable" clause, but also the first, "satisfied, released, or discharged" clause, which is "raised far less often—typically when there is a dispute over the amount of the judgment—and is almost never applied to consent decrees." Id.

When analyzing whether a consent decree has been "satisfied, released, or discharged" as provided in the first clause, the Fifth Circuit instructs that state contract law be used to interpret the terms of the decree. Chisom v. Louisiana ex rel. Landry, 116 F.4th 309, 319 (5th Cir. 2024). "The responsibility of the judiciary in interpreting contracts is to determine the common intent of the parties." Baldwin v. Bd. of Sup'rs for Univ. of Louisiana Sys., 2014-0827 (La. 10/15/14), 156 So. 3d 33, 37. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046. Here, the State argues that the plain terms of the consent decree reflect that the decree has been satisfied, released, or discharged. It submits that the consent decree itself provides that it has "permanent effect, absent a change in federal or state law applicable to

immigration detainers" and that because Act 314 is a change in state law applicable to immigration detainers, the consent decree no longer has permanent effect.

When considering a consent decree under the third, "no longer equitable" clause, courts look to whether "'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" Horne, 557 U.S. at 447 (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992). The State argue that the public has expressed its interest through its elected representatives, who enacted Act 314. It insists that the ongoing enforcement of the consent decree is therefore "detrimental" to the public's interest today.

Under either clause, the plaintiffs' primary argument is essentially the same. They insist that the legislators never intended Act 314 to apply to the consent decree and, in any event, they argue that Act 314 was never valid to begin with. If plaintiffs are correct, arguably Act 314 cannot be considered a change in law that impacts the consent decree, nor could its enactment trigger any equities with regard to the consent decree.

As to the applicability of Act 314 to the consent decree, the plaintiffs argue that the Act prohibits the adoption or having of a sanctuary policy and defines a sanctuary policy as "a law, policy, practice, procedure, or custom adopted or allowed by a state entity or local governmental entity," but does not include a consent decree or legal remedy for constitutional violations in the list. Plaintiffs insist that by failing to include consent decrees and judicial remedies, the legislature must have intended to exclude them. Additionally, they cite the legislative history. In the cited video recordings of the legislative sessions, Representative Landry states that the bill should not affect the Orleans Parish Sheriff's Office being able to "take on the decree," [6] and Senator Miguez

---

[6] Louisiana House of Representatives, Archived Video, May 2024, at 2:27:38,
https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/may/0520_24_24RS_Day36 (last accessed Jan. 20, 2026, at 12:39 p.m.)

states that "in the case of New Orleans, the bill does not violate the consent decree."[7] Immediately following that statement, Miguez explains that the law would not require local agencies to enforce federal immigration law or investigate immigration status and that the law only applied to illegal immigrants who commit crimes. Plaintiffs argue that the legislature did not intend Act 314 to apply to consent decrees like this one and, therefore, there is no conflict between Act 314 and the consent decree.

The plaintiffs next argue that Act 314 unconstitutionally infringes on the home rule principles enshrined in the Louisiana Constitution. The 1974 Louisiana Constitution provides:

> Every home rule charter or plan of government existing or adopted when this constitution is adopted shall remain in effect and may be amended, modified, or repealed as provided therein. Except as inconsistent with this constitution, each local governmental subdivision which has adopted such a home rule charter or plan of government shall retain the powers, functions, and duties in effect when this constitution is adopted.

La. Const. Ann. art. VI, § 4. The City of New Orleans is a "pre1974 home rule government." New Orleans Campaign For a Living Wage v. City of New Orleans, 2002-0991 (La. 9/4/02), 825 So. 2d 1098, 1102. "'[A]lthough home rule does not entail complete autonomy,' 'in affairs of local concern, a home rule charter government possesses powers which within its jurisdiction are as broad as that of the state, except when limited by the constitution, laws permitted by the constitution, or its own home rule charter.'" Id. (quoting Miller v. Oubre, 96–2022, (La.10/15/96), 682 So.2d 231, 236, then Morial v. Smith & Wesson Corp., 2000-1132 (La. 4/3/01), 785 So. 2d 1, 14). Article VI thus "protects home rule governments from unwarranted interference by the state in their internal affairs." Id. at 1103.[8]

---

[7] Louisiana State Senate, Archived Video, March 2024, at 52:00
https://senate.la.gov/s_video/VideoArchivePlayer?v=senate/2024/03/032724SCHAMB (last accessed Jan. 20, 2026, at 12:39 p.m.)

[8] Of note, though, Article VI, Section 9 provides a limitation to ensure "the powers granted to home rule governments will not be used to deprive the state government of its inherent powers." Id. Section 9(B) provides that

Finally, the plaintiffs argue that Act 314 is invalid as an unfunded mandate. Article 6, Section 14 of the Louisiana Constitution provides:

> No law or state executive order, rule, or regulation requiring increased expenditures for any purpose shall become effective within a political subdivision until approved by ordinance enacted, or resolution adopted, by the governing authority of the affected political subdivision or until, and only as long as, the legislature appropriates funds for the purpose to the affected political subdivision and only to the extent and amount that such funds are provided, or until a law provides for a local source of revenue within the political subdivision for the purpose and the affected political subdivision is authorized by ordinance or resolution to levy and collect such revenue and only to the extent and amount of such revenue.

La. Const. Ann. art. VI, § 14(A)(1). The provision essentially "restricts the state's power to enact legislation requiring the expenditure of funds by local political subdivisions unless certain conditions are met." Polk v. Edwards, 626 So. 2d 1128, 1144 (La. 1993).

The State does not address the plaintiffs' arguments that (1) Act 314 was not intended by the legislators to apply to this pre-existing consent decree, (2) Act 314 is invalid because it infringes on the "home rule" provisions of the Louisiana constitution, and (3) Act 314 is invalid as an unfunded mandate. Plaintiffs argue that these three questions should be certified to the Louisiana Supreme Court in the first instance.

The rules of the Louisiana Supreme Court provide that this Court can certify questions or propositions of Louisiana law to the Supreme Court of Louisiana if this Court determines that it has before it "questions or propositions of law of this state which are determinative of said cause independently of any other questions involved in said case and that there are no clear controlling precedents in the decisions of the supreme court of this state." La. Sup. Ct. R. 12, Sec. 1.

---

"Notwithstanding any provision of this Article, the police power of the state shall never be abridged." La. Const. Ann. art. VI, § 9. "The police power of the state is best defined on a case-by-case basis; however, it has been generally described as the state's 'inherent power to govern persons and things, within constitutional limits, for promotion of general health, safety, welfare, and morals.'" Campaign For a Living Wage, 825 So. 2d at 1104 (quoting Smith & Wesson Corp., 785 So. 2d at 15).

16

The State's response to the certification request is somewhat circular. It argues that it is unnecessary to certify these questions to the Louisiana Supreme Court because regardless of whether Act 314 is "valid" or whether it sufficiently "conflicts" with the consent decree to implicate the end of its permanent effect, Act 314 changed the law applicable to immigration detainers, and that alone ends the decree's permanent effect. But if Act 314 is invalid then it is not a change in law. And even if it is valid, if it was not intended to apply to this consent decree, then it cannot be interpreted as triggering the "change in law" provision.

The Court finds that the three questions concerning the applicability and validity of Act 314 should be certified to the Louisiana Supreme Court. Each of these questions requires analysis of a Louisiana law. Two implicate the Louisiana constitution. The first, implicates both statutory interpretation and legislative history. Not one concerns a federal question. Not one question has been addressed by a Louisiana court, let alone the Louisiana Supreme Court. Moreover, all three questions concern Louisiana's public policy. Considering the posture of this case, the Louisiana Supreme Court is in the better position to address these questions. And the Louisiana Supreme Court's resolution of these issues will determine the issue now before this Court. If Act 314 is inapplicable to the consent decree and/or invalid under the Louisiana constitution, then it cannot be a change in law impacting the consent decree and it would not be equitable to dissolve the consent decree as a result of the inapplicable and/or invalid act. If, to the contrary, Act 314 is applicable and valid, then, for the reasons advanced by the State, it must be found that the Act 314 is a change in law that ends the permanent effect of the consent decree by its own terms.[9]

---

[9] Not only does Act 314 require law enforcement agencies to support the enforcement of federal immigration law, but it explicitly prohibits any policy or practice that "prohibits" a law enforcement agency from, among other things "[c]omplying with an immigration detainer." La. Stat. Ann. §§33:82, 33:83, 33:81(6). That (if valid and applicable) would be a change in law that is not "insignificant" and squarely falls within the type of change contemplated by the parties in agreeing that the permanent effect of the policy would last only until a change in law applicable to immigration detainers.

17

Conclusion

The PLRA is inapplicable to this lawsuit because the plaintiffs' claims are not with regard to prison conditions. Accordingly, the consent decree cannot be dissolved by the PLRA's restrictions on prospective relief. Further, while the State may be entitled to relief under Rule 60, the Court finds that three questions of state law, must first be decided by the Louisiana Supreme Court. Accordingly, the Court will certify the following questions to the Louisiana Supreme Court:

4. Does Act 314 apply to the pre-existing consent decree at issue in this lawsuit in light of the text of the statute and the legislative history?

5. Is Act 314 invalid because it infringes on the "home rule" provisions of the Louisiana Constitution?

6. Is Act 314 invalid under Article 6, Section 14 of the Louisiana Constitution as an unfunded mandate?

It is further ORDERED that the Motion to Terminate or Dissolve the Consent Decree (Rec. Doc. 157) is taken under submission pending the resolution of the preceding questions.

New Orleans, Louisiana, this 18th day of February, 2026.

_____
Janis van Meerveld
United States Magistrate Judge